Filed 5/22/15  P. v. Castellano CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  ADRIAN CASTELLANO,  Defendant and Appellant. | F066005  (Fresno Super. Ct. No. F11902219)  **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne Ellison, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne LeMon, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant Adrian Castellano was charged and convicted of count I, second degree burglary, based on his theft of merchandise from a store (Pen. Code,

§§ 459, 460, subd. (b));[1] and count II, felony evading an officer, for leading police officers on a high speed chase against traffic on a busy freeway (Veh. Code, § 2800.2, subd. (a)). He had three prior strike offenses (§ 667, subds. (b)–(i)) for assault with a deadly weapon, based on an incident when he attacked three people with a baseball bat. He was sentenced to the indeterminate third strike term of 50 years to life.

The evidentiary portions of defendant's jury trial on the substantive offenses, and the bifurcated jury trial on the special allegations, were fairly short and straightforward. From the beginning of the criminal proceedings, however, defendant brought numerous motions to discharge his court-appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), to hire retained counsel just days before the scheduled trial date, and to otherwise continue the trial because of his alleged poor health, the belated discovery of purported alibi witnesses, and his general unhappiness with the case. The court repeatedly denied these motions and found they were meritless and brought for purposes of delay because the prosecution faced the potential unavailability of an eyewitness if the case was continued. When the court denied his motions, defendant became belligerent, repeatedly disrupted the proceedings, and tried to delay the trial. The court expressly warned him that his behavior could prejudice the jury and result in his removal from the courtroom.

The court ultimately found a manifest need to restrain defendant during the trial, and the restraints were not visible to the jury. As the trial began, defendant feigned a suicide attempt and refused to leave his cell. He returned to court the following day and engaged in an outburst in the jury's presence. The court ordered him removed, and he did not return for the rest of the trial. He initially appeared at the sentencing hearing,

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

made both *Marsden* and *Faretta* motions, again engaged in another outburst when the motions were denied, and the court ordered him removed.

On appeal, defendant has not challenged the evidence in support of his convictions for the substantive offenses or the special allegations. Instead, he challenges the court's orders, which were necessitated by his disruptive and belligerent behavior. He contends the court lacked any evidence to order him restrained; abused its discretion when it ordered him removed from the courtroom; violated his Sixth Amendment right to counsel when it denied his motion to substitute retained counsel just days before trial started; and improperly denied his motion to represent himself at the sentencing hearing. Defendant also raises several challenges to his third strike term, and the court's denial of his motion to recall his sentence under Proposition 36. We affirm.

## FACTS

### The Kmart Theft [Count II, Felony Evasion]

Around 7:00 p.m. on April 4, 2011, defendant entered the Kmart store located at Shaw and Clovis Avenues. He pushed a shopping cart and placed some personal items in the top portion. Defendant picked up an electric shaving razor valued around $120. He broke open the package and placed the razor in his pocket. Defendant also selected other merchandise. He went to the register, paid for the other merchandise, and did not pay for the razor. He walked out of the store.

Steven Ray Bankston and Aron Dominguez, the store's loss prevention officers, had been monitoring defendant on the surveillance cameras. They saw defendant take and conceal the razor. Bankston called 911 while defendant was standing at the register.

Bankston and Dominguez approached defendant outside the store. They identified themselves and asked him to return to the store with the merchandise. Defendant still had the shopping cart with him. Defendant became hostile and pushed both men away. Bankston asked defendant to stop and told him that the Clovis Police Department was on the way. Defendant replied: "F**k Clovis P.D." Defendant reached into his pocket as if

3.

he was going to pull a weapon. He asked the two men whether they wanted a fight. Bankston replied they did not want to fight, and it was not worth it. At one point, defendant pushed the shopping cart toward the two men.

Defendant got into the driver's seat of a blue Mitsubishi Mirage, which had a large Raiders sticker on the rear windshield. A woman was waiting by the car, and she also got into the car. Defendant drove away, but he left his wallet in the shopping cart. The wallet contained defendant's driver's license and a small bindle of a white, crystal-like substance.

Bankston again called 911 and described defendant's vehicle, gave the license plate number, and the direction it turned out of the parking lot. Bankston and Dominguez subsequently identified defendant as the driver of the car from a photographic lineup.

### *The Pursuit*

Officer Eric Taifane of the Clovis Police Department was driving to the store in response to Bankston's first call about the shoplifting and received the updated information with the description and license plate number of defendant's vehicle. Taifane saw a car that matched the description near Willow and Shaw Avenues. Taifane pulled up to the vehicle, saw a man driving the car, and later identified defendant as the driver.

Officer Taifane activated his patrol car's siren and signal lights, but defendant did not stop. Defendant moved to the right lane as if he was heading for the onramp to Highway 168 at Shaw Avenue. Instead, defendant suddenly drove to the left across all four traffic lanes, ran a red light, and entered the freeway using the "exit" off ramp and driving against traffic. Defendant forced four cars on the ramp to swerve and take evasive action.

Defendant drove eastbound in the westbound lanes of the freeway, crossed lanes against traffic, and accelerated to 100 miles per hour. Several cars were forced to take

4.

evasive action.  Defendant drove off the freeway using the westbound onramp as an exit. He drove up the ramp and turned onto Bullard.

Defendant drove eastbound on Bullard, ran traffic lights, and swerved to avoid traffic.  He turned into a residential neighborhood at a high rate of speed.  The officers terminated the pursuit because it was too dangerous to follow defendant into a residential area at high speed.  Officer Taifane believed 10 cars were forced to take evasive action during the pursuit.

The blue car was registered to Teresa Saldate, defendant's girlfriend.  Defendant was not apprehended, and the car was not found at her address that day.  The police determined defendant had been subject to a traffic stop while driving that same vehicle in February 2011.

**The Target Theft [Count I, Second Degree Burglary]**

On the afternoon of April 9, 2011, defendant and Saldate went into the Target store on Shaw and Clovis Avenues.  Defendant selected several pieces of jewelry, and Saldate picked up an electric razor.  Defendant opened the package and concealed part of the razor and the jewelry on his person.  Defendant and Saldate went to the register. Saldate paid for some merchandise, but she did not pay for the razor and the jewelry. Defendant did not pay for anything and walked out of the store ahead of Saldate.

Brandon Burton, the store's loss prevention officer, had been monitoring defendant and Saldate by following them in the store.  His partner watched them on the surveillance cameras.  Burton confronted defendant outside the store, identified himself, and asked defendant to return to the store.  Defendant refused.  Burton placed his arm in front of defendant and directed him to the store.  Defendant replied, " 'You can't F'ing touch me, you're not an F'ing cop.' "

Burton attempted to detain defendant.  Defendant resisted and they struggled. Burton testified that defendant "twisted and spun two or three times, and I was able to grab ahold of his shirt, and he slipped out of that and took off."  Defendant ran across the

5.

street. Burton called the Clovis Police Department. Saldate was not present during Burton's struggle with defendant.[2]

### *The Pursuit*

Officer Phil Macy responded to the store, spoke to Burton, and received the description of defendant. Macy drove around the area, saw defendant walking in a nearby residential neighborhood, and notified other units. Defendant saw the patrol cars, quickened his pace, and jumped a fence. Macy drove to the next street and saw defendant running in an adjacent shopping center. Several officers and a helicopter joined in the pursuit, and defendant ran back into the residential area. Defendant was not in the officers' continuous sight during the chase. Defendant was eventually apprehended when he was trapped against a wall.

Officer Macy took defendant into custody. Defendant falsely claimed his name was "Samuel Ceja." Burton positively identified defendant at an infield showup. Defendant was not found in possession of any stolen property. Defendant's identity was later determined when his fingerprints were taken.

## DEFENSE

Nadine Chavaria Castellano, defendant's mother, testified defendant lived with her at the time of the alleged store thefts. The blue Mitsubishi belonged to Saldate, and defendant had driven it. Several of defendant's friends also used the car, and they looked similar to defendant based on their appearances, builds, and tattoos.

## PART II

## PROCEDURAL HISTORY

As we have mentioned, defendant's appellate issues are based on the procedural history of this case: His numerous *Marsden*, *Faretta*, substitution, and continuance

---

[2] Saldate subsequently pleaded no contest to misdemeanor petty theft from Target and was placed on probation.

motions, his repeated disruptions, and his voluntary absence. The court eventually ordered him restrained and then ordered him removed after an outburst in front of the jury.

Defendant contends the court abused its discretion and lacked any evidence to order the restraints, remove him from the courtroom, and deny his various motions. In making these arguments, defendant focuses on narrow segments of the proceedings when he displayed the appropriate decorum. We are compelled to review the lengthy history of this case which demonstrates that defendant's pretrial motions and his conduct during the trial were likely part of an attempt to prevent a material prosecution witness from testifying.

**Initial Proceedings**

Defendant was arrested on April 9, 2011, and he was in custody throughout the entirety of the proceedings. On April 22, 2011, defendant was charged in a felony complaint with the second degree burglaries of Target (count I) and Kmart (count III), and it was alleged he had three prior strike offenses and three prior prison term enhancements.

On May 9, 2011, the court appointed Ciummo and Associates as conflict counsel to represent defendant. On July 13, 2011, defendant substituted retained counsel Glenn LoStracco to represent him.[3]

---

[3] On November 30, 2011, defendant conditionally pleaded guilty to two counts of second degree burglary and admitted all special allegations, based on the court's indicated sentence that it would dismiss two of the prior strike convictions and impose a second strike term of eight years four months. The court stated it might decide not to dismiss defendant's prior strike convictions after it reviewed defendant's record, and that defendant could withdraw his plea in that situation. Defendant apparently filed a motion to dismiss the prior strike convictions. The prosecution filed opposition that set forth defendant's lengthy criminal record and strenuously argued the prior strike convictions should not be dismissed. On January 9, 2012, the court granted defendant's motion to withdraw his guilty pleas, presumably pursuant to the terms of the conditional plea.

On February 10, 2012, the preliminary hearing was held. On March 1, 2012, the court granted the motion of Mr. LoStracco to withdraw for nonpayment of fees and reappointed Ciummo and Associates to represent him.

## Pretrial Hearings and First *Marsden* Motion[4]

After several continuances, defendant's trial was set for August 28, 2012. Defendant was represented by Mark Siegel of Cuimmo and Associates for the remainder of the proceedings.

On August 23, 2012, defendant made a *Marsden* motion. The court heard and denied the motion.

On August 28, 2012, a second amended information was filed that charged defendant with count I, second degree burglary of Target; and count II, felony evading an

---

[4] As we will discuss below, defendant made several *Marsden* motions before the superior court. On appeal, he has not challenged the court's denial of those *Marsden* motions. In his opening brief, however, he extensively quoted from specific pages of the confidential reporter's transcripts from certain *Marsden* hearings in support of his claim that he suffered from medical problems which affected his ability to sit through trial. Defendant requested this court order that the rest of the *Marsden* transcripts remain confidential.

In response, the People filed a motion for this court to release the entirety of the *Marsden* transcripts or those sections relevant to defendant's appellate claims. Defendant filed opposition and argued the People could only obtain the pages which he had cited to his in opening brief.

On December 4, 2013, this court partially granted the People's motion and ordered disclosure of certain pages of the reporter's transcripts for the *Marsden* hearings held on August 28, September 6, and October 17, 2012. This court further stated: "If respondent continues to believe facts contained in the other *Marsden* hearing transcripts may be relevant, respondent may request in its brief that this court independently review the *Marsden* transcripts in light of all the briefing and the remaining record on appeal." The People have duly requested disclosure of the rest of the *Marsden* transcripts.

We have reviewed the entirety of the *Marsden* transcripts, find the release of additional confidential transcripts from those hearings is not necessary, and deny the People's request.

officer (based on the car chase after the Kmart incident), with three prior strike offenses for assault with a deadly weapon (§ 245, subd. (a)(1)), based on juvenile adjudications in 1992.[5]

## Second *Marsden* Motion and Request for Continuance

On August 28, 2012, defendant appeared with Mr. Siegel and made another *Marsden* motion.[6] At the *Marsden* hearing, defendant complained he was very sick, he was hurting and in pain, and he was not ready to go to trial. Defendant also complained his attorney did not respect him. The court denied the motion.

After denying the *Marsden* motion, the court advised the prosecutor that defense counsel had been informed about a number of possible defense witnesses and moved for a continuance until mid-September 2012 to contact those witnesses.

The prosecutor objected to the continuance and explained that two material witnesses had joined the military, and one of these witnesses was scheduled to be deployed out of the country on the week of September 25, 2012. The prosecutor argued defendant had "delayed this case purposely all the way through these proceedings" to prevent these witnesses from appearing. The prosecutor clarified that defense counsel was not personally trying to "sandbag" the case, but "the fact that the defendant now on the day of trial is coming up with yet new witnesses in this case, screaming of the games he's been playing all the way throughout this case." The prosecutor found it hard to

---

[5] According to the probation report, defendant's three prior strike offenses were based on a juvenile adjudication for three counts of assault with a deadly weapon (§ 245, subd. (a)(1)): Defendant was 16 years old, and he was with three male adults. They beat two juveniles and one adult; the victims ran away. Defendant and his friends pursued the victims by car and then produced baseball bats and beat the victims again. Defendant beat one victim in the face with the bat. The victim fell unconscious, and defendant struck additional blows to his body. Defendant was committed to the California Youth Authority (CYA) for six years.

[6] This court granted the People's motion to release a portion of the transcript of the August 28, 2012, *Marsden* hearing, limited to pages 904, 913–916, and 929.

believe defendant had just remembered the names of his alibi witnesses and argued defendant was "hoping and praying that the People will lose witnesses, and I'm trying to put the Court on notice that there's a very real possibility witnesses will be lost in this case due to the fact that they are in the military."

The court overruled the prosecutor and held defense counsel had an ethical obligation to contact and interview the witnesses before going forward in the case. The court set the pretrial conference for September 5 and the trial for September 10, 2012. The court advised defendant that most of his *Marsden* complaints were not valid, and he did not have the right to veto his appointed counsel. The court told defendant that he had a duty to work with his attorney, he was doing a great job for him, and additional *Marsden* motions based on the same issues would be unsuccessful. The court stated it would not likely grant any further continuances.

## Motion for Conditional Examination of Prosecution Witness

On September 5, 2012, the prosecution moved for an order to conditionally examine an eyewitness, Steven Bankston, the loss prevention officer at Kmart. Bankston had identified defendant as the person who drove away in the blue car and provided the vehicle description and license plate of the vehicle that the police followed on the high speed pursuit against traffic on the highway (count II). Bankston had joined the Navy, was stationed in Virginia, and was going to be deployed to Japan on or about September 28, 2012. The prosecution requested the conditional examination to obtain Bankston's testimony while he was on leave from September 11 to 28, 2012.

## Motion to Substitute Counsel

On September 5, 2012, Judge Penner convened the pretrial conference and defendant said he wanted to represent himself. However, attorney Richard Ruiz appeared and asked the court to substitute him as defendant's attorney. Ruiz said he would not be ready by the scheduled trial date, there was a newly-discovered witness who would vindicate defendant, and he did not have the factual basis for that information yet.

10.

The prosecutor objected to Ruiz if he was not ready to proceed because a continuance would result in the loss of the witness. Mr. Siegal, defense counsel, said his investigator interviewed defendant and his mother several times, and defendant believed there were other witnesses who would assist the defense. However, counsel did not believe there was any tactical purpose that would be served by another continuance.

Defendant interrupted and addressed the court against counsel's advice. Defendant said he made *Marsden* motions against Mr. Siegal because he acted inappropriately toward him and there was a breakdown in communications. Defendant also said he had been unable to get the money together to hire Ruiz until then, and he felt very confident Ruiz could represent him.

The court denied Ruiz's motion to substitute based on the delay and the substantial prejudice that would result to the People's case if the matter was again continued.[7] As the court made the ruling, defendant repeatedly interrupted. The court advised he would be removed from the courtroom if he was not quiet. Defendant apologized.

Thereafter, defendant asked the court for either another attorney or to represent himself. The court continued the motions to the next day.

**The Court's Findings About Defendant's Motions**

On September 6, 2012, Judge Penner heard and denied defendant's renewed *Marsden* motion.[8] Defendant complained he was sick and in pain, and his attorney wasn't doing anything to help him get medical treatment. Defendant also claimed he delayed telling his attorney about possible defense witnesses because he thought he was going to get a deal instead of going to trial.

---

[7] In issue III, *post*, we will address defendant's contentions about the court's denial of his motion to substitute Mr. Ruiz.

[8] This court granted the People's motion to release a portion of the September 6, 2012, transcript of the *Marsden* hearing, limited to pages 1221–1224 and 1236–1237.

11.

When the proceedings resumed in open court, defendant made a *Faretta* motion and said he would be ready for trial in two weeks. The prosecutor objected to defendant's delaying tactics because of the potential loss of the witness. The court took the matter under submission.

On September 7, 2012, Judge Penner denied defendant's *Faretta* motion because it was untimely and found defendant's motions were part of his attempt to delay the trial.

> "[T]here have been many recent entries of general time waivers and then withdrawals of those general time waivers and then an entry of a specific waiver. There was a continuance on the eve of trial at the last trial date because of a late revelation by the defendant that he had a number of alibi witnesses. The court gave a continuance for the defense to investigate those alibi witnesses. In the face of that continuance, the defendant has refused to give his attorney information on what those witnesses would say ….
>
> "In addition, without going into the content of any of these *Marsden* motions, there have been a number of *Marsden* motions with what the court considers to be incredible accusations against counsel in this case and I believe that *all of these attempts are nothing more than an attempt by [defendant] to either delay the trial or gain some tactical advantage as a result of the People losing a witness at the end of this month*.
>
> "For these reasons, balancing those reasons against the right, the conditional right but a very important right of the defendant for the right to counsel and also under the *Faretta* decision to represent himself, balancing all of those factors against that right, I make a finding that the request for *Faretta* and the request for the right to counsel by Mr. Ruiz were untimely and for that reason, it would result in prejudice to the People because they are losing this witness. For those reasons, I am denying both – I have denied the motion to substitute Mr. Ruiz in and I am now denying the *Faretta* motion…." (Italics added.)

Defendant interrupted, and the court asked him not to speak. Defendant continued to talk and said the court and his attorney were prejudiced against him and violated his rights. The court told defendant he would be removed if he was not quiet. Defendant said his rights were being violated and he might as well leave. The court replied, "All

12.

right then, you can leave." The court confirmed the trial date and adjourned before he was removed.

## THE TRIAL

### The First Day of Trial

On September 10, 2012, defendant's trial was scheduled to begin. Several incidents occurred throughout the day's proceedings. At the beginning of the day, defendant appeared with Mr. Siegel before Judge Hoff for the case to be assigned for trial. Defense counsel stated defendant's mother had just handed him a letter from a third party "who claims to have material knowledge about this case and he says he will not be available under September 24th, so for the record, I'm making a request for a continuance until then." Defense counsel said defendant had mentioned this person's name before, but he never provided any contact information and the letter still did not have that information.

The prosecutor objected to any continuance and argued defendant "desperately doesn't want to go to trial" so the People would lose the witness. Defense counsel advised the court that defendant said he had medical issues, he was in tremendous pain which made it impossible for him to sit through a trial, and defendant had an appointment at a hospital in the next week. Defendant's mother said she was going to retain Ralph Torres to represent defendant, but counsel had not heard from Torres.

Judge Hoff denied defendant's motions without prejudice and assigned the trial to Judge Ellison. Defendant interrupted and said he wanted to represent himself. The court also denied that motion without prejudice.

#### *Defendant Asks to Leave the Courtroom*

Next, the parties appeared before Judge Ellison, who would preside over defendant's trial. Defendant immediately asked to say something. The court said no because he was represented by counsel. Defendant ignored the court and said Mr. Siegal

13.

could not represent him because he was biased and acted inappropriately toward him. Defendant wanted to either have his own attorney or represent himself.

The court carefully admonished defendant about his conduct, and defendant threatened to leave:

> "THE COURT:　　… I'm going to say three things here, sir, in order. First of all, I understand you'd already made a request – as a matter of fact, several requests of the court to have a *Marsden* hearing to have order some other lawyer to be appointed to represent you based upon the representations that you've just made here to the court. Those have been denied. And so we're not revisiting those, sir. That request is denied. I also--
>
> "THE DEFENDANT:　　They said to bring them to your attention here. So you are denying them all too, right? [S]o I feel you are prejudice for me.
>
> "THE COURT:　　The record will reflect that Mr. Castellano is interrupting the court.
>
> "THE DEFENDANT:　　*Get me out of here. I don't want to be here.*
>
> "THE COURT:　　That's the last thing I'm going to tell you. We can do this trial without you.
>
> "THE DEFENDANT:　　Okay. Send me on my way.
>
> "THE COURT:　　Are you telling me you are going to interfere with the court?
>
> "THE DEFENDANT:　　No. I'm telling you you're violating my own rights. You are violating my rights. I don't want to be here.
>
> "THE COURT:　　Mr. Castellano, tell you what we're going to do here. I'm going to go ahead and proceed with these proceedings without you. You have clearly indicated to me you are voluntarily absenting yourself from these proceedings. You have a right to be here.
>
> "THE DEFENDANT:　　I haven't asked you nothing. You are denying everything. Can I be my own lawyer?

14.

"THE COURT: Yes, sir. And I think we've already indicated that. You have had that hearing before Judge Penner. And he indicated your request was not timely. That request was denied.

"THE DEFENDANT: Because of the DA's discretion? So everything works for the DA's side? What about me? I have no rights? Nothing?

"THE COURT: The last thing I want to tell you, Mr. Castellano, is we don't have any room here where you can watch this trial on closed circuit television. I'm not going to have the deputies gag you in the presence of this jury. I think it would further prejudice your case. So the only choice I have left in your behavior as it's being conducted right now here in court is to do this trial without you, sir. That's just the truth." (Italics added.)[9]

The court told defendant he had the right to be present but "you are going to have to behave" or the court would conduct the trial without him. Defendant asked about the People's final plea offer, which had been for 19 years. Defendant said he wanted to think about the plea offer for another day. The court told defendant to speak with his attorney and decide what he wanted to do, and again warned about his disruptions:

"THE COURT: … But your case has been pending a long time here, sir. And now is the day of reckoning. So you are going to make this decision or you are going to go to trial. And if you behave like you've been behaving we'll do the trial without you. [¶] And I want you to understand this, sir, I am not messing around with you. This is going to happen exactly the way I have discussed it. Either you take the disposition. That's up to you. Or you go to trial. That's your decision to make as well. *But you are not going to interrupt this court and disrupt the proceedings as you've just been doing right now*." (Italics added.)

Defendant apologized and asked whether he could have his own lawyer represent him at sentencing if he accepted the plea offer. The court said no because he already had a lawyer. The court again asked defendant if he would behave and not disrupt the

---

[9] In issue II, *post*, we will discuss defendant's repeated threats to leave the courtroom, his voluntary absence, and the court's order to remove him.

15.

proceedings. Defendant said yes. The court called for a recess for defendant to speak with his attorney.

### *Defendant Disrupts the Evidentiary Hearing*

After the recess, the court conducted an evidentiary hearing on the admissibility of defendant's postarrest statements. Officer Hutchinson, who interviewed defendant, was asked to identify him in the courtroom. Hutchinson pointed out defendant and added: "He's the gentleman that just flipped me off."

At the conclusion of the hearing, the court stated defendant had "flipped the bird" to the officer while he testified. The court advised defendant that they were going to select the jury the following morning. The court told defendant that he still had some time to decide whether to accept the offer of pleading to the charges in the information for 19 years, or go to trial with the possible sentence of 50 years to life.

The court admonished defendant that he could not keep bringing the same motions "over and over again," it would not revisit the same issues, and addressed his behavior.

> "The only thing I've heard that's going to happen to change anything is your behavior. And in spite of what you promised me a minute ago you flipped the bird to one of the witnesses. That's inappropriate conduct for a courtroom, sir.… If you behave like that in the presence of the jury, I know your lawyer told you that you are going to prejudice the jury against you. You are. But most importantly I'm not allowing that, sir. I am not allowing that. I'm not allowing you to come in here and act like a person who doesn't belong in court and just have this entire proceeding be some kind of joke. So I just want you to know, we're going to do this trial unless you decide to make this disposition here today .… But you are going to trial. We will do this case without you. I mean, I just want you to know that. We will do this case without you if you continue to behave the way you have gone. It's just as simple as that. This trial can be done. And I've done it in the past. So I don't want you to think that I'd be afraid to do that or, you know, I think that, you know, this is not an important right. I know it's an important right for you to be here. But your right to be here is controlled by your behavior. And I'm not going to have this be a joke here and have you disrupt court proceedings and you think you can stay here. We'll just do the trial without you."

After a brief recess, defense counsel said defendant wanted to "sleep on it" and decide about the plea in the morning. The court stated that it was 3:40 p.m. and defendant had until 4:00 p.m. to decide.

After another recess, defense counsel said defendant rejected the plea offer and wanted his trial. The court asked defendant if that was his decision. Defendant replied he did not know, and he needed more time. The court declined to give him more time, and the trial would begin the next morning. The court again admonished defendant to control himself and treat his attorney with respect.

**The Second Day of Trial – the Court's Order to Restrain Defendant**

On September 11, 2012, the court convened but delayed jury selection. Instead, it conducted an evidentiary hearing with Deputy Kerry Mason about statements that defendant made after the previous day's hearing.

Deputy Mason testified that as defendant was leaving the courtroom the previous day, the deputies searched him because Mr. Siegel was not sure if defendant still had his pen. Mason testified defendant said: "[W]ell, I could get a pen any time I wanted to." Mason searched defendant and did not find the pen. During the search, another deputy told defendant the judge was still in the courtroom, and he needed to be careful about his demeanor. Mason testified defendant said: "*[T]his isn't – this isn't nothing. Wait until you see what happens tomorrow*. And nothing was said about the statement. And it just ended like that." (Italics added.)

In light of this incident, the court stated that Sergeant Rosander of the sheriff's department requested to have defendant restrained in the courtroom because of his prior criminal history and his statement. The court made the following findings:

> "[I]t's the court's ultimate finding that there is a manifest need for restraint of [defendant] here in the courtroom, based not only on what I have just heard from the deputy and he's just testified about, but the court's own perceptions of what's been going on here and the history of this case as I understand it.

17.

"And to really to summarize it very succinctly, it's very clear to me from prior proceedings that I have read relating to [defendant's] various requests to continue this trial, requests to delay the trial by taking such actions as seeking to discharge his lawyer and making false claims about his lawyer in that regard, and seeking at the last minute to represent himself in order to obtain a delay of the trial, and although we're going to talk about this at some length in the context of pretrial motions, all for the obvious purpose of avoiding the fact that the witnesses in this case who are available, as the People have made clear in several proceedings in the defendant's presence, only this month, in an attempt to delay the case so the witnesses will not be available to the People to testify against him.

"It's the court's view, based on what happened here yesterday, in particular the court's own observations that at some point during the proceedings yesterday when the defendant was unshackled in court that his first act was to put his hand on Mr. Siegel's shoulder – and I want you to know, [speaking to defendant], Mr. Siegel didn't complain about that. I saw it. And it was the court's view that sitting as close as the two of you were that it was a little odd to see you behave in that fashion, given your, in this court's view, false accusations about Mr. Siegel having made homosexual advances to you [at the *Marsden* hearing]. That the very first thing that you did was undertake to pat him on the back.

"[I]t's clear to me that you are prepared to do anything you want and anything you can to delay this trial. And I'm not going to have anybody in this courtroom be hurt or injured in some attempt to delay this trial. And the court, of course, is fully aware of recent events in this court – don't interrupt [speaking to defendant].

"THE DEFENDANT:     I've seen lawyers and inmates hug.

"THE COURT:     The court is fully aware of other incidents in other courtrooms in this courthouse in which acts of violence have resulted in delays of trials. And I'm also aware that doesn't matter how many deputies we put in this courtroom, that as a practical matter there's just not enough deputies that can be available to stop an incident of the kind that the court's concerned about. [¶] And under the circumstances here of your prior criminal history and acts of violence, although [albeit] as a teenager ….

"THE DEFENDANT:     20 years ago.

"THE COURT:     That's right. I'm finding there is a manifest need to restrain you during the course of this trial. At the same time as I have said

18.

that, I'm also concerned, as the court is required to be, about not prejudicing you in the presence of this jury."

The court proposed to follow the sheriff's department recommendation to tether defendant to the table so he could not step away and directed the department to work it out before the jury was selected. The court did not order any restraints on defendant's hands at that time.[10]

The court again reminded defendant that it was prepared to remove him from the courtroom if he disrupted the trial in the jury's presence. The court noted that defendant talked, made comments, and made an obscene gesture at a witness despite his assurances that he would not be disruptive. The court advised defendant he had the right to be present for the trial, but he would give up that right by his own actions and there were "consequences to your continuing behavior."[11]

Defendant asked to say something. The court said no, and his attorney would speak for him. After a brief off-the-record discussion, Mr. Siegel said defendant wanted to accept the plea deal. The court replied it was too late, and defendant had been advised the deadline to accept it was the previous day.

The court proceeded to consider the parties' motions in limine and other pretrial matters.

At the end of the proceedings that day, Mr. Siegel advised the court that defendant said he was in pain, he was going to miss his medical appointments if the trial proceeded, and defendant wanted a continuance. The court denied the continuance request.

---

[10] In issue I, *post*, we will address defendant's contentions about the court's order for restraints.

[11] In issue II, *post*, we will address the court's warnings to defendant about being removed and his subsequent absence from the trial.

**The Third Day of Trial – Defendant's Further Efforts to Delay**

On the morning of September 12, 2012, the court was about to begin jury selection. Mr. Siegel stated that defendant had retained Ralph Torres to represent him, and Torres was ready to proceed if defendant's *Marsden* motion was denied. The court asked if defendant was making another *Marsden* motion. Defendant said yes. The court asked if there was any new evidence to support the motion. Defendant said there was nothing new.

The court said it would grant the substitution if Torres was ready because it did not have any interest "in precluding [defendant's] right to have counsel of your choice." The court again admonished defendant to behave himself because the court wanted him to remain in the courtroom.

> "But I've just got to warn you, you act up in the presence of this jury, you will waive your right to be here. It's just as simple as that. You know, any kind of actions like that can only serve to prejudice your case. But I'm not going to allow you to get yourself a new trial or some new jury just because you act on your own to prejudice your case. That will not be a remedy for you. Just want you to know that. I'm just hoping that I don't even need to talk about that…."

Defendant said he was in pain, he needed to see the doctor, and he was unable to sit through the trial. The court replied that it was aware of defendant's claims about his physical condition, he had raised these issues before Judge Penner, and Judge Penner did not find his claims credible. However, the court clarified defendant was making another *Marsden* motion. The court heard and denied the motion.

### *Renewed Faretta Motion; Defendant's Request to Leave*

As the proceedings continued on September 12, 2012, the court addressed defendant's *Faretta* motion. The court noted defendant made the same motion the previous week and Judge Penner denied it because it was untimely. The court denied defendant's renewed *Faretta* motion for the same reason. Defendant repeatedly

20.

interrupted and argued that he could "go pro per anytime."  The court advised him to stop interrupting.

The following exchange occurred:

"THE DEFENDANT:  I don't want to be here because I'm hurting.  I'm being in pain.  You are denying rights for medical.  You are denying rights for *Faretta*.  I'm going through pain.  He don't want to go over and get the doctor.  You don't care.  I'm hurting right now.  I can't be here, so get me out of here.

"THE COURT:      Is that your request?

"THE DEFENDANT:       I'm hurting.  I want to go to medical right now.  You can get me out of here.  I need to see –

"THE COURT:      Mr. Castellano, the court doesn't believe you.

"THE DEFENDANT:       I got records.

"THE COURT:      Mr. Castellano, I don't want you to prejudice yourself with this jury panel.  We're going to bring you up here.  I want you to know that if I'm going to be forced to make a choice–

"THE DEFENDANT:       You cut me off.

"THE COURT:      Are you asking to be removed now?

"THE DEFENDANT:       I'm hurting.  I want to see medical.

"THE COURT:      Mr. Siegel, it's the court's intention to have [defendant] removed from the courtroom given his statements."

Both defendant and his attorney objected.  Mr. Siegel stated defendant was not so ill that he could not participate in the proceedings.  Defendant interrupted and asked how Mr. Siegel knew how he felt.  The court called for a recess and advised Mr. Siegel to talk with defendant and explain the situation to him.  The court said it would not forcibly remove defendant from the courtroom, but it would not permit defendant to prejudice the jury panel if he misbehaved in their presence.

21.

The court noted defendant was already restrained under the table "in a fashion that is a silent restraint that cannot be seen by prospective jurors at any location in the courtroom."

> "The court did find there was a manifest need to find a restraint. The court did not find a need that there was a restraint that could potentially prejudice the prospective jurors seeing that. And that's the court's continued position in, I guess, consideration of the defendant's conduct throughout the course of the trial so far."

The court said a "modesty panel" had been installed around the entire table to cover the restraints, but defendant had chosen to sit further away from the table. Both the prosecutor and defense counsel agreed the restraints were arranged so they could not been seen as long as defendant sat close to the table.

The court again admonished defendant about his behavior:

> "[Y]ou've presented the court and your lawyer with a very difficult situation…. I'm not saying you haven't got a medical condition. What I'm saying is it's clear you are able to be here in court for trial. And this decision that you've made not to be here is yours. And so, fundamentally, I'm not going to make you stay if you are going to end up prejudicing your jury by acting up in their … presence. If you tell me that you are afraid that that's what's going to happen and you are going to further prejudice your case and you want to be excused from the courtroom, I'll exceed to that request. If you want to stay here, then you are going to stay. And I'll leave it to your behavior."

After the recess, Mr. Siegel advised the court that defendant wanted to remain in the courtroom, but he was going to continue to raise "in open court" the issue of his medical treatment, and he was "not going to follow Your Honor's instructions. [I]t's probably going to be easier for me to explain to the jury panel an empty chair like Clint Eastwood rather than any outside bursts by [defendant] in their presence."

The court disagreed with counsel's tactical decision, and decided defendant should remain in the courtroom. However, the court again admonished defendant that he would be removed if he continued to disrupt the proceedings in the jury panel's presence.

22.

Defendant asked the court to wait until attorney Ralph Torres arrived. The court said no, it was going to begin jury selection.[12] Defendant said he was in pain, but he would stay in the courtroom.

Thereafter, the court conducted jury selection, and a jury was selected and sworn. Defendant was present in the courtroom and did not disrupt the proceedings.

## The Fourth Day of Trial – Defendant's Alleged Suicide Attempt and Voluntary Absence

On September 13, 2012, defendant's trial resumed outside the jury's presence. The court stated that defendant was not present and conducted another evidentiary hearing about defendant's conduct.

Sergeant Rosander, the head of court security, testified he was in the courtroom the previous day when defendant complained that he was in too much pain to sit through the trial, and the court denied his objections. Rosander testified that when the court went off the record, he heard defendant say: " 'Well, if I can't get my medical treatment, then I'll just attempt suicide tonight and I'll get it that way.' "

Sergeant Rosander testified that at 7:30 a.m. that morning, he learned defendant had been placed in a safety cell by the jail's mental health staff for his own protection. Defendant told guards he swallowed razor blades and 40 to 60 pills. There was no independent evidence that he actually ingested those items. The jail's mental health staff would not allow defendant to leave the safety cell because he was under observation. Rosander was told, however, that appropriate arrangements could be made if defendant was willing to appear in court.

Sergeant Rosander testified he went to the jail that morning and personally observed defendant in the safety cell. The jail staff "popped an ammonia inhalant under

---

[12] There is no evidence Mr. Torres arrived in court or moved to substitute as defendant's counsel.

his nose, and he cover[ed] his face and [made] audible noises, but would not talk to us." Defendant was repeatedly told the judge had ordered him to appear in court, and the trial would start without him if he refused. Defendant grunted but did not speak. The jail staff proposed placing defendant in a restraint chair and escorting him to court, but Rosander declined. Rosander testified he made it clear to defendant that if he did not go to court, his case would proceed without him, but defendant did not respond.

Sergeant Rosander testified defendant was "laying on the side in the jail and he was conscious and faking it, or semi conscious, because he did move, he did make auditory noises, he did cover his face." The jail was equipped to handle such medical situations, but the staff had not observed any behavior which would warrant taking him to the hospital.

Sergeant Rosander further stated that a correctional officer had heard from the jail staff that defendant was "maybe trying to plan some type of an escape. And once [defendant] took the pills and swallowed the razor blades, he made statements, 'Now you have to take me to the hospital.' But it was deemed that due to his size and the small razor blades, that they would not take him to the hospital, they would keep him in jail under direction of the medical staff."

Sergeant Rosander was also told by the jail staff that defendant said, " 'Well, if you take me to court, then you're going to have to take me in a wheelchair and take me outside of the building,'… which would open up another avenue of possibility of escape." The jail staff advised defendant he would be taken to court through the internal tunnels. Rosander advised the court that if the jail staff believed defendant actually swallowed pills and razor blades, they would have taken him to the hospital for treatment.

The court asked whether defendant appeared to be unconscious or suffering from an overdose. Sergeant Rosander replied that in his personal experience, "unconscious people … usually don't cover their faces. When they're unconscious, they don't make any moves, they just lay there. But today he did make a conscious [move] of covering

his face up.  So whether or not he was totally conscious and faking it, or maybe partially conscious, I don't know, but he was definitely conscious enough to make auditory noises and cover his face."

### *The Court Makes Findings About Defendant's Voluntary Absence*

The court found defendant had voluntarily left the courtroom:

> "The court has let [defendant] know, through deputies this morning, as I had done on several occasions directly to [defendant] here in court, that if he undertakes to engage in behavior that is disruptive of the court, that if he refuses to come to the courtroom, we're going to do this case without him.  And it's the court's view, from everything I have heard in this subject matter, that *what's going on here in the jail right now is – it's just part of his ongoing and continuing efforts that began long ago to avoid this trial, to delay this trial at all costs, and any event, anything he can come up with to do so, including all of the Faretta motions and allegations that he has lied to the Court about, about one moment he couldn't be ready for two weeks, yesterday he could be ready to represent himself – or the day before – I can't remember – immediately.*  The misrepresentations about you [referring to defense counsel], frankly, in relation to various requests under *Marsden*.  So it's the Court's view that, first of all, that [defendant's] purported suicide attempt is most likely just another lie.  More importantly, that whatever he may have done to himself or not done to himself last night, that he's clearly capable of coming to court and is making a decision not to do so."  (Italics added.)

Defense counsel stated defendant had hepatitis-C and was in tremendous pain, which adversely affected his ability to participate in the trial.  Counsel speculated that defendant's behavior was because he had not received requested medical treatment.  Defense counsel moved for a continuance until defendant's medical issues were addressed.  In the alternative, since the jury had already been sworn, counsel moved for a mistrial because defendant was physically unable to be present.  Counsel argued the court could grant the prosecutor's pending request for a conditional examination of the witness who was about to be deployed out of the country.

The court found that defendant's assertions about his physical condition were not true and represented his "ongoing attempt to manipulate these proceedings for purposes

25.

of obtaining what he has wanted from the very beginning, which is to have a trial in which these witnesses are unavailable." Defendant had sat through other proceedings without complaint.

The court also decided a conditional examination of the prosecution's witness would be "a weak second" to having him testify before the jury, and "the People's case should not be prejudiced by being required to have some lesser evidence, some conditional examination, because [defendant] wants to manipulate the proceedings."

The court found defendant had intentionally absented himself from the trial, despite the court's repeated advisements to him, and the trial would proceed in his absence.[13] The court asked defense counsel to speak with defendant in the jail at the end of the day, advise him of the court's ruling, and that he still have the opportunity to change his mind and appear in court.

### *The Special Instruction to the Jury*

The jury was brought into the courtroom and the court read the following instruction, which both parties had approved.

> "As you can see …, the defendant … is not here in court this morning. Like all criminal defendants, [he] has an absolute right to be personally present in court for all proceedings in his case, including the presentation of evidence, which we're about to begin this morning. In spite of that right, [defendant] has chosen not to participate in these proceedings and has declined to be present in court today. Whether [defendant] will change his mind tomorrow, or as the trial continues thereafter, we cannot know at this time. Whatever he decides, you are not to hold [his] decision to be absent against him, nor are you to consider the fact that he is absent from court in any way in marking your decisions in this case."

The jury trial continued with the prosecution's case, including the testimony from Steven Bankston, the witness who was scheduled to be deployed out of the country.

---

[13] In issue II, *post*, we will address defendant's contentions about his absence from the courtroom.

Bankston identified defendant as the man who entered the vehicle which led the officers on the high speed chase on the freeway.

At the end of the day, the court stated that it expected defense counsel to speak with defendant in the jail to inform him of the court's ruling about his failure to appear, and that he could change his mind and attend the next session. The court also stated that as a practical matter, defendant would waive his right to testify if he did not appear the next day, since the evidentiary portion of the trial would be completed by then.

**The Fifth Day of Trial; Defendant's Return and His Outburst**

On September 14, 2012, the court convened the trial outside the jury's presence and stated the following information: Defendant told a deputy that he would return to the courtroom, but he wanted a wheelchair and refused to dress out. There were no known physical reasons for defendant to use a wheelchair, but the court directed the deputies to use it and bring defendant to court in his jail attire.

Defense counsel said he tried to speak to defendant the previous night, but the deputies determined there was no way for him to conduct a secure interview. Counsel tried to speak with defendant again that morning in the holding cell, but defendant had not arrived. The court said defense counsel could speak to defendant when he arrived.

### *Defendant Returns to the Courtroom*

After a brief recess, the court said defendant had arrived in a wheelchair, he was dressed for trial, and he was restrained with "a silent tether to the floor." Sergeant Rosander said additional restraints were placed on defendant as he was being brought into court to avoid any possibility of escape. The court noted defendant had a "belly chain, and his hands restrained in a fashion that anybody who comes in the court will see." The court asked Rosander if these restraints could be removed, and Rosander agreed.

The court asked defense counsel if defendant would move from the wheelchair to a regular chair. Counsel replied defendant was "displaying signs of being comatose, at

27.

least in the sense that his eyes are closed." The court said defendant appeared "somewhat unresponsive to the proceedings with his eyes closed." However, a deputy advised the court that he spoke with defendant within the hour. In light of that information, the court asked defense counsel to speak with defendant and determine his current condition, and whether he would sit in the chair.

After another recess of about 30 minutes, the court stated the deputies removed defendant because he asked to use the restroom. Sergeant Rosander said defendant got out of the wheelchair and walked into the restroom, and "apparently his statement that he cannot get out of the wheelchair is a false statement."

Defendant returned to the courtroom in the wheelchair. In light of defendant's ability to walk to the restroom, the court ordered defendant to remain in the wheelchair and tethered to the floor. The court brought in the jury and directed the prosecutor to continue with the People's case.

### *Defendant's Outburst*

Defendant was in the courtroom during the introduction of evidence from officers about the high speed chase on the highway. The next witness was Brandon Burton, the Target employee, who testified about defendant's actions in the store. As Burton testified, defendant suddenly interrupted the trial:

> "THE DEFENDANT: I want to object myself. I'm tired of being here. The reason why I – I'm in here – I tried to commit suicide yesterday–

> "THE COURT: Take the jury out.

> "[THE DEFENDANT:] –because they're violating my rights. I tried to fire my lawyer five times and they give me the same lawyer. I tried to commit suicide yesterday and I almost died yesterday. That's why I'm in a wheelchair. They're violating my rights. I'm a three-striker – for this stupid charge, I'm a three striker, 25-to-life, for this one charge. That's why they're trying to do all this. I got daughters and kids like all you guys. Daughters and kids, like all your guys. They're violating all my rights. I tried to fire my lawyer five times."

The jurors were escorted out of the courtroom. The court reminded defendant that he knew the consequences of this behavior, and "[y]ou're done with me in here, sir. [¶] Take him back to the jail."

When the jury returned, the court read the following instruction:

> "… I'm really sorry about what happened here and the situation that occurred just before we took the break. I just want you to know, first of all, you know, that that – the things that [defendant] had to say, you're not to hold any of that against him, his behavior here. You're not to take into account making your judgments in this case anything that he told you here before he left the courtroom. Okay? Just set it aside, don't let it affect your judgment. That's the rule. I'll talk to you some more about it at the end of the trial."

### *The Court's Additional Findings*

At the end of that day, outside the jury's presence, the court summarized defendant's actions as an "ongoing process" of attempting to delay or obstruct the trial by "pretending to have conditions that he doesn't have." The court believed there was no reason to make an additional record or "drag" defendant into court "against his will" to clarify whether he wanted to return to court and testify. "I think it seems clear he has twice promised me, once implicitly, and once explicitly, that he would behave, and on both of those occasions, he's violated that trust. He flipped off … an officer witness on the stand in the presence of the court and the witness, after he had told me that he would not engage in disruptive behavior, and, then of course, he yelled at the jury here this morning."

The parties rested and there was no further testimony in the guilt phase of the trial.

## Instructions, Closing Arguments, Verdict

On September 17, 2012, the court convened for instructions and closing arguments. Prior to bringing in the jury, the court stated defendant was still in custody, he was not present, and nothing had changed from its earlier findings. Mr. Siegel

29.

requested defendant's presence, but stated he had not visited defendant or received any communications from him.

The court again made findings about defendant's conduct and his absence:

"[I]n normal practice I might bring [defendant] up here for every occasion, or at least have the jail personnel talk to him on every occasion to see if he changed his mind. But he has twice indicated to the court that he would behave and then violated that indication. And under the circumstances here this court's view is that even if [defendant] told me today that he changed his mind and was going to behave, the court wouldn't believe him to undertake to do that. It's … the court's view, based on all the things that have happened in this case, both while he has been present in this courtroom and before in other courtrooms, indication in *Marsden* motions and *Faretta* requests, that it is his intent to do everything he can to delay or defer this trial so the witnesses will be unavailable and simply to disrupt the proceedings for his own personal benefit. Therefore, the court's not going to undertake to examine the subject matter any further. [Defendant], in the court's view, has made a decision to be absent from trial by his conduct, so we're going to proceed ahead."

When the jury returned to the courtroom, the court instructed that defendant was not present, and the jury was not to hold that against him. Later that day, the jury found defendant guilty of the two charged offenses.

**Bifurcated Jury Trial on Special Allegations**

After the guilt phase, the court conducted the jury trial on the special allegations, as previously requested by defendant. Defendant did not return to the courtroom, and the jury found the special allegations true.

During the bifurcated trial, the court noted outside the jury's presence that defendant was not present, and it did not intend to change its ruling given defendant's prior behavior. Defense counsel said defendant had not contacted him, but he moved for defendant to be present during the sentencing hearing. The court agreed since a jury would not be present at the sentencing hearing.

30.

## The Sentencing Hearing

After he was convicted, defendant filed a *Marsden* motion but also requested to represent himself at the sentencing hearing pursuant to *Faretta*. Defense counsel filed a request to dismiss defendant's prior strike offenses pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

On October 17, 2012, the court conducted the sentencing hearing. Defendant was present with Mr. Siegel. As the court reviewed defendant's pending motions, defendant interrupted the court.

> "My right, where is my right to testify? That's my Constitutional right. My right was violated. I want to file a *Marsden* hearing right now. I want to testify, and I felt if I were to testify, there would have been a different outcome in this whole thing. I feel that my rights were violated, and there's new evidence on the *Marsden* hearing, so I want to have a *Marsden* hearing."

The court conducted the *Marsden* hearing.[14] In response to defendant's complaints against him, Mr. Siegel said defendant appeared "sophisticated and competent to assist counsel if he wanted to," and he never had the impression that defendant "didn't understand what was going on." Mr. Siegel also addressed defendant's failure to testify in his trial:

> "I think the reason why he didn't testify is because the court ordered him removed from the courtroom. I did visit him in the middle of these proceedings, after court, this is before things had reached that stage. We spoke behind the glass, but the last conversation I had with him before the trial ended, behind the glass, was a fairly civilized one, and I told him, it is really not part of my game plan that you testify, I don't think it would assist you. Probably not a good idea for you to testify, but you have the right to testify it you want to.

---

[14] This court granted the People's motion to release a portion of the October 17, 2012, transcript of the *Marsden* hearing, limited to page 3312.

"So I certainly never told him, I certainly never deprived him of the right to testify.  I guess in effect the court has found that he deprived himself of that right by his behavior in court.

"I don't think I ever agreed that he could be removed from the court, that he could be removed from the trial.  As far as I can remember, I made timely objections, the court nevertheless found that he had waived his right to appear at his trial, and hence to testify by his own conduct."

Mr. Siegel also stated that he did not call Teresa Saldate as a witness because he decided it would not be a good tactical decision.

### *The Court Orders Defendant's Removal from the Courtroom*

When the court resumed the proceedings, defendant interrupted and said he was not done with his *Marsden* motion and he wanted to make a *Faretta* motion.  The court denied his motions because they were part of his "continuing attempt … to delay the proceedings at all costs, including faking having tried to kill yourself in the jail, including pretending that Mr. Siegel here had made homosexual advances against you, which is a thorough lie."[15]

Defendant complained that his constitutional rights were being violated.  The court replied that he had a right to be present for his trial and sentencing, he gave up that right when he disrupted the trial, he was "continuing to disrupt" the proceedings, and "I'm going to have you removed from these proceedings and go ahead with sentencing unless you are prepared to be quiet."

Defendant kept talking about his *Marsden* motion and that the jury saw his restraints.  Mr. Siegel objected to removing defendant from the courtroom.  The court replied:  "I'm not going to have his mouth taped shut so we can do this, that's offensive to anyone who comes in this public courtroom."  Defendant repeatedly stated he was

---

**15** In issue IV, *post*, we will address defendant's contentions that the court erroneously denied his *Faretta* motion at the sentencing hearing.

taking medication and he was not competent. The court ordered him removed from the courtroom.

After defendant was removed, the court stated: "I have never seen anything like this in a courtroom, but this gentleman's behavior speaks for itself." The court denied defendant's motion to dismiss the prior strike convictions and sentenced him to the third strike term of 50 years to life.

## DISCUSSION

### I.     The Court's Order to Restrain Defendant

Defendant contends the court violated his due process rights when it ordered him "shackled for the entire trial in leg restraints anchored to the floor." Defendant asserts the court improperly ordered him to be restrained "[b]efore trial began, and based largely upon the nature of the charges and [his] prior felony convictions 20 years earlier."[16] Defendant argues there was no evidence to support the court's order, and his convictions must be reversed because of his "severe pain caused by an on-going medical condition [and] the psychological harm caused to [him] by the unnecessary and inhumane shackling disrupted his ability to participate in the trial…."

As we will explain, defendant's contentions ignore the procedural history of this case and his repeated efforts to disrupt and delay his jury trial. The entirety of the record supports the court's finding of a manifest need to order restraints.

### A.  Restraints

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be

---

[16] Defendant's prior strike offenses were not adult convictions but juvenile adjudications for three counts of assault with a deadly weapon.

33.

subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles ... unless that use is "justified by an essential state interest" – such as the interest in courtroom security – specific to the defendant on trial.' [Citation.]" (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559 (*Lomax*).)

" 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained ....' [Citation.] Moreover, '[t]he showing of nonconforming behavior ... must appear as a matter of record ....' [Citation.]" (*People v. Cox* (1991) 53 Cal.3d 618, 651, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"When the objectionable conduct has occurred outside the courtroom, 'sufficient evidence of that conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for [physical] restraints .…' [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 561.)

" 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 559.)

When determining the existence of manifest need, the court need not find "prior conduct of the exact type about which the court is concerned, or that the defendant himself personally had engaged in such conduct. A court's decision about the use of restraints involves a prediction of the likelihood of violence, escape, or disruption weighed against the potential burden on the defendant's right to a fair trial. Given the serious potential consequences on both sides of the scale, the range of factors the court may consider in assessing and weighing the risks should be broad. [Citations.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

"The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th p. 559.) The court must make its own independent determination regarding restraints on a case-by-case basis. A general policy to restrain all persons is not sufficient, and the court cannot delegate the decision to security or law enforcement personnel. (*People v. Mar* (2002) 28 Cal.4th 1201, 1218; *People v. Miller* (2009) 175 Cal.App.4th 1109, 1114.)

Even if the court erroneously ordered restraints, the error will be deemed "harmless if there is no evidence that the jury saw the restraints,… or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 596.) "Even a jury's brief observations of physical restraints generally have been found nonprejudicial. [Citations.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1213, disapproved on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176 [185 Cal.Rptr.3d 431, 441–442].)

**B. Analysis**

The court decided to order defendant restrained on September 11, 2012, which was the second day of his trial and before the selection of the jury. Defendant asserts the court abused its discretion because he appeared numerous times without incident and promised not to interfere with the proceedings.

35.

Defendant's assertions are meritless and refuted by the record. The court's order for restraints cannot be considered in a vacuum, and must be addressed in light of the defendant's conduct throughout the criminal proceedings. Defendant initially escaped apprehension in this case after leading the police on a high-speed chase the wrong way on a busy freeway. The fact that defendant did not perform a violent act or attempt to escape after he was arrested did not foreclose the court from finding a manifest need based on his belligerent, disruptive, and nonconforming conduct in the courtroom, which raised the threat of violence.

The court expressly found a manifest need for restraints based on defendant's disruptive behavior which began during the pretrial hearings and escalated as the trial approached, and those findings are supported by the record. When the court warned defendant about his behavior, defendant promised to maintain decorum but almost immediately broke his promises with numerous outbursts, interruptions, and threats to leave.

Defendant's conduct became more disruptive as the evidentiary portion of the trial began. After the court denied his latest round of *Marsden*, *Faretta*, and continuance motions, defendant made a veiled threat to the deputy who searched him for the pen: "[T]his isn't nothing. Wait until you see what happens tomorrow." The court learned about defendant's statements the next morning, conducted an evidentiary hearing, and made extensive findings of a manifest need for restraints.

The court did not order defendant restrained because he brought multiple *Marsden* and *Faretta* motions, but because of the strong indication that he was trying to delay and disrupt his trial at all costs, and prevent the appearance of one of the prosecution's witnesses. Given the nature of defendant's initial and desperate escape on the freeway, together with his history of violence, belligerent courtroom conduct, and the threat to the deputy upon being searched, the court did not abuse its discretion when it ordered "silent" restraints which were not visible to the jury. "A court's decision about the use of

restraints involves a *prediction* of the likelihood of violence, escape, or disruption weighed against the potential burden on the defendant's right to a fair trial." (*People v. Bryant*, *supra*, 60 Cal.4th at p. 390, italics added.)

The court also did not abuse its discretion when it found a continuing need for the restraints as the trial progressed. After the court's order for restraints and denial of his latest motions, a deputy heard defendant say he would attempt suicide to get his way. The next morning, defendant allegedly attempted suicide attempt and refused to return to court. He agreed to return the following day, but demanded to use a wheelchair and thought he would be taken outside the jail, and the jail staff was concerned he was planning an escape. He returned to court in the wheelchair and acted comatose, but then went to the restroom without assistance. Upon the resumption of trial, he immediately disrupted the proceedings with his outburst in front of the jury, telling them that he tried to commit suicide, he wanted to fire his attorney, and he faced a third strike. The court ordered his removal and he did not return to the trial.[17]

Defendant's repeated disruptions, suspicious behavior, and statements to the court and the deputies supported the court's continuing order for restraints. While he might have promised to behave himself early in the proceedings, he violated his promises almost immediately and took extraordinary steps to delay the trial.

Defendant contends the court's order for restraints was prejudicial and requires reversal for the following reason:

> "[Defendant] had serious on-going medical problems, which resulted in severe pain and blood in his urine. Shackling compounded the debilitating physical and psychological pain [defendant] was suffering, as evidenced by the fact that he was unable to sit in court for any extended period of time without having to use the restroom, the fact that he required the assistance of a wheelchair, the fact that during trial he became

---

[17] In issue II, *post*, we will address defendant's absence from the courtroom.

despondent and attempted suicide, and the fact that he was continuously in pain during the trial."

In making this argument, defendant cites to his own statements to the court as evidence of his medical condition. We note that on June 7, 2011, at the very beginning of the criminal proceedings, defendant appeared in front of Judge Vogt for a status hearing. Defendant asked the court to "get my medical issues on track" said he had a "staph" infection, he was bleeding, he was jumped, he was hit in the face, he needed surgery for a dog bite on his thumb, he had a concussion, and "I'm going to die here before the next court date." Defendant said a doctor had recommended certain antibiotics, pain medication, and his personal shoes, but he did not get them. Defendant complained the jail didn't give him "a pain killer" or let him see "medical" for his various problems.

Judge Vogt ordered defendant referred to the jail medical staff "to address any and all issues" that he had. Defendant asked for an order to wear his personal shoes "for stability." The court replied that if there was documentation about a specific medical need, "the jail medical staff is directed to review that."

While defendant repeatedly claimed he did not receive appropriate medical care, defendant seriously eroded his own credibility with the court in innumerable ways, which likely led to the court's justifiable doubts about his repetitive claims regarding his relationship with his appointed counsel, his alleged attempts to hire retained counsel, and, most of all, the true state of his physical condition.

Defendant's assertions about his physical inability to sit through the trial are refuted by his own conduct, such as his reaction to the ammonia inhaler after the alleged suicide attempt, his feigned unconsciousness when he returned to court in the wheelchair, and his ability to get out of the wheelchair and walk to the restroom without assistance. During his outburst before the jury, defendant made very clear and cogent statements about his potential third strike term, alleged suicide attempt, and efforts to fire his attorney – further indicating his actions were carefully calculated.

38.

More importantly, defendant never claimed the restraints were painful, exacerbated any of his purported medical conditions, or prevented him from participating in his defense or consulting with his attorney. (See, e.g., *People v. Slaughter*, *supra*, 27 Cal.4th at p. 1214.) In addition, there is no evidence the jurors saw the restraints. The court and the attorneys concurred that defendant was restrained under the defense table in such a manner the jurors could not see the restraints.

The court's finding of manifest need must be based on evidence of violence, the threat of violence, *or* other nonconforming conduct. (*Lomax*, *supra*, 49 Cal.4th at p. 559.) Defendant's "nonconforming conduct" gave rise to the threat of violence and supported the court's order for restraints. The court's order was based on defendant's conduct and the particular facts of this case rather than any type of generalized policy, and it did not simply defer to requests by the prosecutor or security personnel. The court extensively addressed the matter outside the jury's presence with the prosecutor and defense counsel, repeatedly warned defendant about the consequences of his actions, and summarized its specific concerns about defendant's conduct throughout the entirety of the criminal proceedings.

## II. The Defendant's Absence from Trial

Defendant's next issue is based on the court's order which removed him from the courtroom after he interrupted a witness in front of the jury. Defendant did not return during the guilt phase or the bifurcated jury trial on the special allegations. Defendant returned for the sentencing hearing but he was removed because he again disrupted the hearing.

Defendant contends the court abused its discretion and violated his constitutional rights when it ordered him removed critical stages of his trial, including participating in his defense for the guilt phase and bifurcated trial on the special allegations, assisting counsel, confronting witnesses, and testifying before the jury.

As we will explain, the court did not abuse its discretion because defendant's absence from the courtroom was initially voluntarily, he was repeatedly warned that he would be removed if he continued to interrupt the court, and he was ultimately removed because of his disruptive behavior.

A. **Absence of the Defendant**

"A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)  The defendant's right to be present at all critical stages includes the presentation of evidence to the jury and sentencing.  (*People v. Concepcion* (2008) 45 Cal.4th 77, 81; *People v. Doolin*, *supra*, 45 Cal.4th at p. 453.)

However, the defendant's right to presence is not absolute.  (*Illinois v. Allen* (1970) 397 U.S. 337, 342–343 (*Allen*); *People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*).)  The defendant's "privilege may be lost by consent or at times even by misconduct.  [Citations.]"  (*Snyder v. Massachusetts* (1934) 291 U.S. 97, 106; *Gutierrez*, *supra*, 29 Cal.4th at p. 1202.)

> "[A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.  Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.
>
> > "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.  The flagrant disregard in the courtroom of elementary standards

40.

of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." (*Allen*, *supra*, 397 U.S. at pp. 343–344, fn. omitted.)

Section 1043 addresses such situations and " 'was designed to prevent the defendant from intentionally frustrating the orderly processes of his trial by voluntarily absenting himself.' [Citation.]" (*Gutierrez*, *supra*, 29 Cal.4th at pp. 1204–1205.)  It provides in relevant part:

"(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.

"(b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:

"(1) Any case in which the defendant, *after he has been warned by the judge that he will be removed if he continues his disruptive behavior*, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

"(2) Any prosecution for an offense which is not punishable by death in which the defendant is *voluntarily absent*.

"(c) Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim his right to be present at the trial as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (§ 1043, italics added.)

In situations where the defendant is disruptive, "[a] trial court need not wait until actual violence or physical disruption occurs within the four walls of the courtroom in order to find a disruption within the meaning of section 1043." (*People v. Price* (1991) 1 Cal.4th 324, 406.)  In addition, the trial may continue "in a custodial defendant's absence after the trial has commenced in the defendant's presence – without first obtaining the defendant's written or oral waiver of the right to presence – if other evidence indicates the defendant has chosen to be absent voluntarily.…  A defendant's 'consent need not be

41.

explicit. It may be implicit and turn, at least in part, on the actions of the defendant.' [Citations.]" (*Gutierrez*, *supra*, 29 Cal.4th at p. 1206.) For example, a custodial defendant "who refuses to leave the lockup" may be " 'voluntarily absent' " if the trial court has taken "reasonable steps to ensure that being absent from trial is the defendant's choice." (*Ibid*.)

"An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law. [Citation.]" (*People v. Waidla*, *supra*, 22 Cal.4th at p. 741.) However, the reviewing court "must give considerable deference to the trial court's judgment as to when disruption has occurred or may reasonably be anticipated. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 773.)

## B. Defendant's Disruptions and Threats to Leave

Defendant asserts the court abused its discretion when it ordered him removed after making comments in the jury's presence. In making this argument, he relies on a brief period of the trial when he was allegedly "well-behaved, even after he was shackled to the courtroom floor, never once threatening physical harm and never once being physically disruptive." Defendant concedes he "interrupted the court a few times by speaking out-of-turn." He describes these moments as "minor" and "not excessive," and argues the incidents did not warrant his removal from courtroom.

As with his arguments about restraints, defendant's version of the events leading to his removal is completely refuted by the record. Despite the court's numerous warnings, defendant engaged in disruptive behavior which initially led to the restraints, his voluntary absence, and then his removal from the courtroom.

Indeed, defendant threatened to leave his trial almost from the beginning of the proceedings, and his threats appeared to be part of his strategy to delay and disrupt the case. When the court denied defendant's earlier *Marsden* and *Faretta* motions, he

displayed anger and frustration, and demanded to leave the courtroom. In response to his threat to leave, the court advised defendant he had the absolute right to be present but warned the trial would proceed without him if he voluntarily left, and admonished him to work with his attorney and not prejudice the jury.

After defendant made an obscene gesture to the witness at the evidentiary hearing, the court complied with the provisions of section 1043, subdivision (b)(1) and unequivocally warned him that he would be removed if he continued to disrupt the proceedings. A short time after this warning, as he was being searched for defense counsel's pen, defendant advised one of the deputies, "[T]his isn't nothing. Wait until you see what happens tomorrow." The court learned about defendant's statements the next morning, conducted an evidentiary hearing, and made extensive findings of a manifest need for restraints. In addition to ordering restraints, the court again warned defendant he would give up his right to be present for the trial if he continued to disrupt the proceedings, and he would not remain in the courtroom.

Nevertheless, defendant's disruptive behavior escalated after the restraint order. On the following day, the court heard and denied defendant's renewed *Marsden* and *Faretta* motions. Defendant repeatedly interrupted and said he wanted to leave.

> "THE DEFENDANT: *I don't want to be here* because I'm hurting. I'm being in pain. You are denying rights for medical. You are denying rights for *Faretta*. I'm going through pain. He don't want to go over and get the doctor. You don't care. I'm hurting right now. *I can't be here, so get me out of here.*
>
> "THE COURT: Is that your request?
>
> "THE DEFENDANT: I'm hurting. I want to go to medical right now. You can get me out of here. I need to see–
>
> "THE COURT: *Mr. Castellano, the court doesn't believe you.*
>
> "THE DEFENDANT: I got records.

"THE COURT: Mr. Castellano, I don't want you to prejudice yourself with this jury panel. We're going to bring you up here. I want you to know that if I'm going to be forced to make a choice–

"THE DEFENDANT: You cut me off.

"THE COURT: *Are you asking to be removed now*?

"THE DEFENDANT: I'm hurting. I want to see medical.

"THE COURT: Mr. Siegel, it's the court's intention to have [defendant] removed from the courtroom given his statements." (Italics added.)

The court said it would not forcibly remove defendant from the courtroom, but it would not permit defendant to prejudice the jury panel if he misbehaved in their presence.

"[Y]ou've presented the court and your lawyer with a very difficult situation.… I'm not saying you haven't got a medical condition. What I'm saying is it's clear you are able to be here in court for trial. *And this decision that you've made not to be here is yours. And so, fundamentally, I'm not going to make you stay if you are going to end up prejudicing your jury by acting up in their ... presence*. If you tell me that you are afraid that that's what's going to happen and you are going to further prejudice your case and you want to be excused from the courtroom, I'll exceed to that request. If you want to stay here, then you are going to stay. And I'll leave it to your behavior." (Italics added.)

After a recess, the situation appeared to settle down. Defendant agreed to stay in the courtroom and he did not disrupt jury selection. At the conclusion of that day's proceedings, however, a deputy heard defendant say, outside the jury's presence: "Well, if I can't get my medical treatment, then I'll just attempt suicide tonight and I'll get it that way."

## C. **Defendant's Voluntary Absence**

On appeal, defendant focuses on the court's order to remove him after his outburst in front of the jury. However, defendant voluntarily absented himself from the courtroom the day before the court's removal order.

44.

On the fourth day of trial, the court learned about defendant's statements after the previous day's hearing, that he would attempt suicide to get his way. The court also learned that defendant claimed to have ingested razors blades and pills to commit suicide, although there was no independent evidence to support his claim. Notably the jail staff did not find it necessary to administer medical aid or take him to the hospital, and there was no independent evidence that he attempted suicide.

Sergeant Rosander testified defendant was advised the trial would start without him, but defendant would not respond and acted as if he was unconscious. However, he moved around, made noises, and covered his face when confronted with an ammonia inhaler, and he was either "conscious and faking it, or semi conscious." Rosander also testified about the concerns that defendant was planning some type of escape if he was taken outside the jail.

A criminal defendant may not frustrate the orderly the process of court by refusing to appear. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1369.) While the court did not obtain defendant's written or oral waiver of presence, there is overwhelming evidence that defendant chose to be voluntarily absent from his trial based on his prior conduct and statements, the court's warning that the trial would continue in his absence, the circumstances surrounding his alleged suicide attempt, his feigned unconsciousness in the observation cell, and his refusal to leave the jail. (*People v. Howze* (2001) 85 Cal.App.4th 1380, 1396; *Gutierrez*, *supra*, 29 Cal.4th at p. 1206 [defendant waived his right to be present at trial by his refusal to exit cell]; *People v. Rogers* (1957) 150 Cal.App.2d 403, 413 [self-induced medical condition for the purpose of disrupting proceedings is a waiver of the right to be present].)

### D. Defendant Returns and Disrupts the Trial

Defendant's repeated disruptions, threats to leave, and voluntary absence were merely the prologue to the court's order to remove him from the trial. On the day following the alleged suicide attempt, defendant agreed to return to court but demanded

to use a wheelchair even though the jail staff reported there was no medical necessity for one. Sergeant Rosander advised the court the jail staff was concerned about a possible escape. Outside the jury's presence, defendant was wheeled into the courtroom with additional restraints, and he acted unconscious. During a recess, however, he rose from the wheelchair and walked to the restroom on his own power. Defendant returned to the courtroom in the wheelchair, and the court again found a manifest need for restraints since he was feigning illness but capable of walking.

Thereafter, the jury entered the courtroom, the prosecution resumed its case, and matters seemed to remain calm. Defendant was restrained in the wheelchair and the court later explained the restraints were not visible. The calm was short-lived. As a witness testified about the Target incident, defendant interrupted the proceedings with his outburst in the jury's presence, and the court ordered him removed.

### E. Analysis

The court did not abuse its discretion when it ordered defendant's removal, and the record supports its extensive findings that defendant's actions were an "ongoing process" of obstructing the trial by making numerous *Marsden* and *Faretta* motions, "pretending to have conditions that he doesn't have," and doing "everything he can to delay or defer this trial so the witnesses will be unavailable.…"

On appeal, defendant concedes his right to be present could have been waived by his own courtroom disruptions. He insists, however, that his conduct did not rise to that level. He admits that he verbally and "momentarily" interrupted a witness in front of the jury, but asserts the court properly addressed the matter by immediately removing the jury from the courtroom. Defendant claims this "isolated incident" did not support the court's decision to order his removal from the rest of the trial.

As explained above, a defendant has a constitutional interest in personally attending trial proceedings but the right is not absolute, and a disruptive defendant waives his right to be present at trial. (*Allen*, *supra*, 397 U.S. at pp. 342–343; *People v. Sully*

46.

(1991) 53 Cal.3d 1195, 1239.)  Defendant's arguments about his alleged conforming conduct are based on an extremely narrow view of the record and ignore the events that preceded his outburst in front of the jury, including his repeated threats to leave the courtroom and his voluntary absence.  As the court found, defendant engaged in constant efforts to delay and disrupt his trial at all costs, despite the court's warnings that his conduct might prejudice the jury or result in restraints or his removal.  These disruptions culminated in his outburst in front of the jury, after he had feigned unconsciousness in the wheelchair.  The court was not obliged to wait for violence to occur within the courtroom to find a disruption within the meaning of section 1043.  (*Gutierrez*, *supra*, 29 Cal.4th at p. 1208; *People v. Price*, *supra*, 1 Cal.4th at p. 406.)

Defendant complains the court failed to consider less intrusive means of maintaining decorum short of removing him, such as giving him a short "cooling off" period from the trial, which would have allowed the court to assess his conduct and permit his return.  In this case, however, defendant "cannot seriously claim that he lacked 'full knowledge and appreciation' " that his misconduct would "likely result in his exclusion from the courtroom.  [Citation.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1181.)  "The manifest purpose of the warning requirement [in section 1043] is to inform a defendant of the consequences of further disruptions so as to allow him a final opportunity to correct his behavior.  That purpose was satisfied here .…" (*People v. Sully*, *supra*, 53 Cal.3d at p. 1240.)  Defendant was repeatedly warned about the consequences of his disruptions.  In spite of these warnings (or perhaps because of them), defendant continued to disrupt the proceedings, the court concluded he feigned a suicide attempt and, when the court proceeded with the trial in his voluntary absence, he returned to the courtroom, feigned unconsciousness, and almost immediately engaged in an outburst that might have been specifically intended to prejudice the jury.  The court allowed defendant more than ample time to cool off during the numerous incidents which

preceded his outburst in front of the jury. (See, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 739.)

In addition, the court was not required to "affirmatively inquire whether a defendant wishe[d] to return to trial and [was] willing to conduct himself properly. It is a defendant's duty to 'reclaim' his right to be present at trial by moving to do so and by demonstrating a willingness 'to conduct himself' consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.' [Citations.]" (*People v. Banks*, *supra*, 59 Cal.4th at p. 1181.) "Defendant was given the opportunity mandated by [section 1043] to correct his errant behavior; he declined it. No more was required to justify his voluntary absence. Section 1043, like other provisions of law, does not require idle acts." (*People v. Sully*, *supra*, 53 Cal.3d at p. 1240.) Defendant waived his constitutional right to remain in the courtroom by his own actions, taken with full knowledge and appreciation of the consequences. (*Id*. at p. 1239.) Given the circumstances, the court was not required to give defendant new warnings or advise him about his right to return to the courtroom. (See, e.g., *People v. Medina*, *supra*, 11 Cal.4th at p. 738.)

Defendant contends the court lacked any evidence to find he was "feigning illness" after his alleged suicide attempt because it simply relied on its own observations and Sergeant Rosander's testimony instead of hearing evidence from a medical professional. Unfortunately for defendant, his own behavior undermined his claims about his purported medical condition. He claimed to have attempted suicide by ingesting razor blades and pills but there was no independent evidence that happened. Defense counsel never called the jail medical staff to refute Sergeant Rosander's description of defendant's condition as he feigned unconsciousness in his cell. When defendant finally agreed to return to the courtroom, he claimed he needed a wheelchair and acted unconscious. But when he needed to use the restroom, he rose from the wheelchair and walked without assistance. His outburst in front of the jury further

undermined his feigned conduct, just a short time earlier, of allegedly being unconscious.[18]

We further find the court did not abuse its discretion when it ordered defendant removed from the sentencing hearing. Defendant again engaged in the same belligerent and disruptive behavior when the court denied his *Marsden* and *Faretta* motions at that hearing. The court again warned he was going to be removed if he continued to disrupt the sentencing hearing. Defendant ignored the court's warnings and continued to interrupt, and the court ordered him removed from the courtroom and imposed the third strike sentence. Given defendant's repeated refusal to maintain decorum, the court was not required to seek less restrictive means or allow defendant a cooling off period based on his continued disruptive conduct and the numerous warnings he had received throughout the criminal proceedings. (*People v. Medina*, *supra*, 11 Cal.4th at pp. 738– 739.)

### *Defendant's Alleged "Desire to Testify"*

As a separate matter, defendant asserts the court violated his constitutional right to testify when it ordered his removal. Defendant claims he had "expressed a desire to testify in his own defense … but the removal order prevented him from exercising that right." There is no evidence defendant expressed his desire to testify before he was removed. At the sentencing hearing, defendant complained his removal prevented him from testifying. However, defense counsel explained that prior to defendant's removal, he recommended that defendant should not testify, and there is nothing to refute this evidence.

---

[18] We note that there were lengthy proceedings which followed defendant's alleged suicide attempt – including the remainder of the prosecution's case, the defense case, closing arguments, jury deliberations, the bifurcated trial on the special allegations, the sentencing hearing, and the motion to recall his sentence. There was no evidence that defendant suffered adverse consequences or required medical care consistent with his claim that he had ingested razor blades and pills.

In any event, defendant's argument about testifying is based "on the erroneous premise that a court may never exclude a defendant if such exclusion might collaterally infringe on constitutional rights. The courts have consistently held that although a defendant has the constitutionally protected right to be personally present at trial, that right can be waived when, despite warnings, a defendant persists in unduly, contumacious behavior. [Citation.]" (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1233.)

> "When a defendant forfeits the right to attend trial personally because of his unruly behavior, certain constitutional rights (such as the right to confront witnesses) are necessarily lost. These constitutional rights are waived because of the defendant's conduct, not because the state has denied him such rights. While the state must accord due process to a defendant, '[d]ue process does not require the presence of the defendant if his presence means that there will be no orderly process at all.' [Citation.]" (*Ibid.*)

In this case, defendant's own behavior led to his exclusion. The court did not abuse its discretion when it declined to "drag" him back into the courtroom, shortly after his outburst in front of the jury, to make a record on this point. While defendant's absence "allegedly 'prevented' him from timely asserting his right to testify, his contumacious behavior waived his right to be personally present, and thereby waived the attendant benefits of being personally present: to confront witnesses against him, to assist counsel in his defense, and to assert in a timely manner his right to testify. Since the right to testify can be waived by conduct and does not require a personal and explicit waiver [citation], we conclude [defendant's] conduct waived his right to assert a desire to testify." (*People v. Hayes*, *supra*, 229 Cal.App.3d at pp. 1233–1234, fns. omitted.)

### III. The Court's Denial of Defendant's Motion to Substitute Retained Counsel Richard Ruiz

Defendant contends the court violated his constitutional rights when it denied his motion on September 5, 2012, a few days before the scheduled start of trial, to substitute privately retained counsel Richard Ruiz in place of Mr. Siegel, his appointed counsel.

50.

The court did not abuse its discretion or violate defendant's constitutional right to counsel when it denied the motion, because Mr. Ruiz was not prepared and requested a continuance on the eve of trial.

## A. <u>Right to Retained Counsel</u>

"A criminal defendant … has the due process right to appear and defend with retained counsel of his or her choice. [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 152.) However, the defendant's right to retained counsel is not absolute. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) "A criminal defendant's right to decide how to defend himself should be respected unless it will result in 'significant prejudice' to the defendant or in a 'disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citation.]" (*People v. Ortiz* (1990) 51 Cal.3d 975, 982.)

A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar, [citation]." (*United States v. Gonzalez-Lopez, supra*, 548 U.S. at p. 152.) "[T]he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time." ' " (*People v. Ortiz, supra*, 51 Cal.3d at pp. 983–984.)

As a related matter, the trial court generally "has discretion whether to grant a continuance to permit a defendant to be represented by retained counsel. [Citation.]" (*People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.) "A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' [Citation.]" (*People v. Courts* (1985) 37 Cal.3d 784, 790–791.) The court must balance the competing interests of the defendant's right

to choose his own counsel against the need for speedy resolution of criminal trials. (*People v. Pigage*, *supra*, 112 Cal.App.4th at pp. 1367–1368; *People v. Jeffers, supra,* 188 Cal.App.3d at p. 850.)

Where the defendant requests a continuance on the eve of trial, the lateness of the request may be a significant factor justifying denial absent compelling circumstances to the contrary. (*People v. Courts*, *supra*, 37 Cal.3d at p. 792, fn. 4.) In determining whether denial of a continuance is so arbitrary as to violate due process, we must examine the circumstances of each particular case, particularly the reasons presented to the trial court. (*Ibid.; People v. Blake* (1980) 105 Cal.App.3d 619, 624.) The court's denial of a continuance to retain counsel is reviewed for an abuse of discretion. (*People v. Pigage*, *supra*, 112 Cal.App.4th at p. 1367.)

B. **Analysis**

Defendant argues the court violated his Sixth Amendment right to be represented by Mr. Ruiz because there are "uncontroverted facts" that he engaged in due diligence to hire him. Defendant further argues there is no evidence his motion to substitute Mr. Ruiz was made to delay the proceedings, particularly since the prosecution had already received continuances prior to the start of trial.

Based on the circumstances of the case and defendant's conduct, the court did not abuse its discretion when it denied defendant's motion to substitute Mr. Ruiz as retained counsel and obtain a continuance on the eve of trial. We have extensively addressed defendant's repeated efforts to delay and disrupt his trial, particularly with the approaching trial date and the looming unavailability of the prosecution's witness. The court properly denied the substitution motion because of the delay and substantial prejudice which would result to the prosecution's case. While Mr. Ruiz was likely unaware of defendant's tactics, defendant's substitution motion appears consistent with his efforts to impose other procedural roadblocks, delay the trial, and lose the prosecution's witness.

Defendant acknowledges the court denied the substitution motion because Mr. Ruiz was not prepared for trial, and the requested continuance might have led to the loss of the People's witness. Defendant argues the court's concern about that witness was "a nonissue" because the prosecution had already moved for a conditional examination to preserve that witness's testimony, and the defendant had not objected to the motion. Defendant argues his "constitutional right to counsel of choice" trumped the court's concerns about the impact on the People's material witness.

Defendant is correct that the People, out of an abundance of caution, had moved for a conditional examination of the material witness just before Mr. Ruiz moved to substitute into the case. The People or defense may move for a conditional examination of a witness in certain circumstances, including when a witness "is about to leave the state .…" (§ 1336, subd. (a); § 1335; *People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1509.) The trial court has discretion whether to grant a conditional examination. (*People v. Mays* (2009) 174 Cal.App.4th 156, 172.) In this case, the court was faced with weighing the competing interests of defendant's request for counsel of his choice against the discretionary determinations of whether to grant a continuance on the eve of trial, which would have required the court to also order a conditional examination of the material witness as time neared for the witness to be deployed out of the country. The court did not abuse its discretion when it decided a conditional examination of the prosecution's witness would be "a weak second" to having him testify before the jury, and found "the People's case should not be prejudiced by being required to have some lesser evidence, some conditional examination, because [defendant] wants to manipulate the proceedings."

## IV. The Court's Denial of Defendant's *Faretta* Motion at the Sentencing Hearing

Defendant next contends the court violated his constitutional right to represent himself when it denied his *Faretta* motion at the sentencing hearing. Defendant argues the *Faretta* motion was timely since he filed a written motion prior to the sentencing

hearing, and it should have been granted because he did not ask for a continuance and he was ready to proceed.

## A. *Faretta*

"A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers. [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 97–98.) A motion for self-representation at sentencing must be made within a reasonable time prior to the commencement of the sentencing hearing. (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.) The erroneous denial of a proper *Faretta* request is reversible error per se. (*People v. Valdez, supra*, 32 Cal.4th at p. 98.)

However, *Faretta* and later cases "have made clear that the right of self-representation is not absolute. [Citations.]" (*Indiana v. Edwards* (2008) 554 U.S. 164, 171.) A *Faretta* motion may be denied "if the defendant is not competent to represent himself [citation], is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations], or the motion is made for purpose of delay [citation]." (*People v. Lynch* (2010) 50 Cal.4th 693, 722, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.)

A *Faretta* motion "made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice" is not unequivocal and may be denied. (*People v. Marshall* (1997) 15 Cal.4th 1, 23.) "Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation …." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.) " 'Trial courts are not required to engage in game playing with cunning defendants who would present Hobson's choices.' *Faretta* … held generally that a defendant may represent himself. It did not establish a game in which defendant can engage in a series of machinations, with one misstep by the court resulting in reversal of an otherwise fair

trial." (*People v. Clark* (1992) 3 Cal.4th 41, 115, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) "[B]y juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions," a court may reasonably conclude the defendant was "playing 'the *Faretta* game' " in an effort to delay the trial. (*People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.)

The "court possesses much discretion" to decide "whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation." (*People v. Welch*, *supra*, 20 Cal.4th at p. 735.) The court's exercise of discretion will not be disturbed in the absence of a clear abuse. (*Ibid*.)

## B. Analysis

By the time of the sentencing hearing, defendant had made numerous *Marsden*, *Faretta*, continuance, and substitution motions. Despite earlier promises to maintain decorum, defendant displayed belligerent and disruptive conduct each time his motions were denied, culminating in the court's order for restraints, defendant's threatened and then voluntary absence, his outburst before the jury, and his removal from the courtroom.

As the sentencing hearing approached, defendant filed a motion which demanded both a *Marsden* hearing and to represent himself. Defendant appeared at the hearing and, as the court attempted to sort out his various motions, he immediately interrupted and engaged in the same type of behavior which resulted in his earlier removal from the courtroom. After the court heard and denied his *Marsden* motion, defendant again interrupted and said he wanted to represent himself. The court denied his *Faretta* motion because it was part of his "continuing attempt" to delay and disrupt his trial "at all costs." As the court addressed his *Faretta* motion, defendant again interrupted and repeated claims previously made at other hearings. The court admonished defendant to be quiet or he would be removed from the courtroom. Defendant ignored the court's warnings, continued to disrupt the hearing, and the court ordered him removed.

Given defendant's lengthy and consistent history of disruptive behavior, the court acted within its discretion when it denied defendant's *Faretta* motion at the sentencing hearing. Defendant's outburst showed that his *Faretta* motion was part of his renewed efforts to interfere with the court's process and conclusion of his trial. (See, e.g., *People v. Howze*, *supra*, 85 Cal.App.4th at p. 1398.)

> " 'The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.' [Citation.] '[A]n accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel *and that he is able and willing to abide by rules of procedure and courtroom protocol*.' [Citation.] This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill." (*People v. Welch*, *supra*, 20 Cal.4th at p. 734, italics added in original.)

While a jury was not present for the sentencing hearing, the court was not required to permit defendant to take control of the hearing, as he attempted to do throughout the criminal proceedings in this case:

> "The judges of our courts are entitled to conduct their proceedings in an orderly and just fashion, and are not required to place their dockets and courtrooms at the mercy of obstreperous and unruly defendants with long track records of disruptive behavior. Such defendants, may not thwart the functioning of the criminal justice system in this state by making manipulative motions designed to result in the disruption of serious court proceedings for the perceived benefit of the defendant. Just as defendants have certain rights in court, so do courts have the power to preserve their dignity and their basic ability to function. In this case the court acted properly in denying the motion for self-representation and no abuse of discretion occurred." (*People v. Howze*, *supra*, 85 Cal.App.4th at pp. 1398–1399.)

## V.    Defendant's Prior Juvenile Adjudications as Strikes

The second amended information alleged defendant had three prior strike offenses, based on three juvenile adjudications for assault with a deadly weapon (§ 245, subd.

(a)(1)), all of which were from the same case in 1992. After a bifurcated trial, the jury found the special allegations true. At the sentencing hearing, the court imposed two consecutive third strike terms of 25 years to life for counts I and II, for an aggregate sentence of 50 years to life.

Defendant contends his prior juvenile adjudications do not qualify as strikes within the meaning of *Apprendi v. New Jersey* (2000) 530 U.S. 466 since he did not have the right to a jury trial in the juvenile proceedings. Defendant concedes that in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1010, the California Supreme Court rejected this identical argument, but raises the issue to preserve it for further review. We note his contentions and follow *Nguyen* in rejecting his arguments. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## VI.     Imposition of the Third Strike Term

Defendant contends the court abused its discretion when it denied his request to dismiss two or more of the three prior strike offenses, and instead imposed an aggregate third strike term of 50 years to life. Defendant argues the court should have dismissed the prior strikes since the three juvenile offenses occurred 20 years earlier, arose from a single incident, and his current felony offenses were not violent.

### A. Section 1385

Section 1385 grants trial courts the discretion to dismiss a prior strike conviction if the dismissal is in furtherance of justice. (§ 1385, subd. (a); *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529–530.) In deciding whether to dismiss a prior strike conviction, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies...." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

57.

The trial court's decision not to dismiss a prior strike conviction is reviewed under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*).) An abuse of discretion is established by demonstrating the trial court's decision is "irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) When the record shows the trial court considered relevant factors and acted to achieve legitimate sentencing objectives, the court's decision will not be disturbed on appeal. (*Ibid.*)

## B. Defendant's Request to Dismiss the Strikes

After he was convicted, defense counsel filed a request to dismiss the prior strike offenses to avoid an indeterminate third strike term. According to the motion, the prior strike offenses arose from a single juvenile case when defendant was sixteen years old in 1992, when defendant and two adults attacked three victims with baseball bats. The motion conceded defendant had not led "an exemplary life" after the juvenile adjudications, but he did not commit any serious or violent felonies after that time. The motion also conceded defendant's current convictions involved conduct which endangered others, but the offenses did not justify a third strike term. Defendant also argued his "poor health" which had been "brought to the attention of the court" precluded his being a serious threat to society.

## C. The Prosecution's Opposition

The prosecution's opposition argued the court would abuse its discretion if it dismissed any of defendant's prior strike offenses. It summarized defendant's lengthy juvenile and adult records, which consisted of 10 felony offenses and nine misdemeanors. When defendant was 13 years old, he had juvenile adjudications for battery, threatening school personnel and robbery. The prior strike offenses were based on juvenile adjudications for three counts of assault with a deadly weapon, based on his attack on

58.

three people with a baseball bat; he was sentenced to a maximum term of six years in the California Youth Authority.

Defendant was 37 years old at the time of trial, and his adult convictions began in 1998 with possession of a sawed-off shotgun; he was placed on probation but violated the terms and was sentenced to three years in prison. He was released on parole in 2001, but returned to custody numerous times until he was discharged in 2004.

In 1999 and 2000, defendant was convicted of three counts of misdemeanor driving while intoxicated and two counts of misdemeanor spousal abuse. In 2002, he was convicted of misdemeanor battery and disturbing the peace. In 2004 and 2005, he was convicted of two separate felony convictions for driving under the influence. He violated probation and was sentenced to seven years eight months in prison, after the court granted his motion to dismiss and imposed a one-strike term. In 2009, defendant was again convicted of driving under the influence and sentenced to four years in prison, after the court dismissed all his prior strikes.

As for the current offenses, the prosecution noted defendant's conduct endangered the community when he led the police on a high speed pursuit against traffic on a busy freeway. Defendant continued to reoffend despite receiving leniency in prior cases where the strike offenses were alleged. The prosecutor also challenged defendant's claim of poor health because of the lack of supporting evidence.

### D. **The Sentencing Hearing**

At the sentencing hearing, the court made extensive findings about defendant's prior convictions and his current offenses.[19]

> "[I]f we were simply talking about stealing from Lowe's or possession of drugs, those are crimes which I would agree in this court's view, even though, you know, the three strikes law might apply to them,

---

[19] We recite the entirety of the court's findings because they are relevant to other sentencing issues raised by defendant.

that there, that perhaps 25 to 50 to life doesn't really fit that behavior. Perhaps it doesn't. That's why I think in some of these cases, [defendant] has, by other judges, at other times, been given breaks…. And the strikes have been stricken [in previous cases] for purpose of those sentencing to allow him to go to probation.

"In one instance, I believe, Judge Nunez even sent him to Delancy Street, and instead of doing what he was supposed to do, he took off and engaged in other crimes….

"But the situation presented here before this jury, where [defendant] drives a hundred miles an hour, at 6:30 or so in the evening on Highway 168 in the wrong direction, that puts the lives of everyone at risk, babies, mothers, everybody on that highway, with complete disregard for their safety, because he wanted to get away. That's the truth of the matter ….

"He is desperate. The desperation is right here in this courtroom. And that desperation makes him a danger to everyone, and this court has a fundamental obligation to protect the community. Not [to] punish [defendant] because he's a bad man, but to protect the community. And that's exactly what I'm intending to do here. Is because in this court's view, that despite the nature of the crimes that caused all of this in the first place, which is essentially shoplifting, [defendant's] behavior suggests that it would not be in the interest of justice to grant probation, or to strike any strikes, or to allow a situation that would give him something less than the maximum under law. Because this court fundamentally is convinced that [defendant] will not stop. He will simply not stop. And that's the sad truth of it. And I don't know that it's, I don't think it is the fault of anybody here in this courtroom, but it is the truth."

The court denied defendant's request to dismiss the prior strike convictions, and found the two offenses were "wholly separate crimes, on wholly separate dates." The court imposed two consecutive third strike terms of 25 years to life for counts I and II.

### E. **Analysis**

As explained, *ante,* we review a ruling upon a request to strike a prior felony conviction under a deferential abuse of discretion standard. (*Carmony, supra,* 33 Cal.4th at p. 371.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.) "Because the circumstances must be 'extraordinary ... by which a career criminal can be deemed to fall

60.

outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], *the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.* Of course, in such an extraordinary case – where the relevant factors ... manifestly support the striking of a prior conviction and no reasonable minds could differ – the failure to strike would constitute an abuse of discretion." (*Id*. at p. 378, italics added.)

The instant case is not the type of extraordinary one contemplated by *Carmony, supra*, 33 Cal.4th 367. The trial court herein carefully considered the enumerated factors and reasonably concluded defendant could not be deemed outside the spirit of the "Three Strikes" law, based on the nature of his criminal activity in both the prior strike convictions and the instant matter. Defendant's criminal activities began before the juvenile adjudications which constituted the prior strike offenses, and continued after he was discharged from that case. In addition, he received the benefit of judicial discretion when his prior motions were granted to avoid imposition of a third strike term. Nevertheless, defendant continued to reoffend, and jeopardized the lives of the public as led the police on a high speed chase the wrong way on the highway. The mere fact that defendant's three prior strike offenses arose from a single juvenile adjudication does not mean the court abused its discretion by declining to dismiss one or more. (See, e.g., *People v. Benson* (1998) 18 Cal.4th 24, 35–36; *People v. Scott* (2009) 179 Cal.App.4th 920, 930.)

We note that in *People v. Vargas* (2014) 59 Cal.4th 635, the court held that when a defendant has been convicted of committing a single criminal act on a single victim that results in two felony convictions under different statutes, the trial court abuses it sentencing discretion if it fails to dismiss one of the two prior strike convictions. (*Id*. at pp. 640–649.) We believe *Vargas* does not apply to this case because defendant's prior

61.

strikes were based on three juvenile adjudications for assaulting three different victims with a baseball bat. While the strikes arose from the same incident, defendant committed multiple offenses against multiple victims of violence.

On this record, the court's decision was "neither irrational nor arbitrary and [did] not constitute an abuse of its discretion." (*Carmony, supra,* 33 Cal.4th at p. 379.) Rather, since "the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the [Three Strikes] law," we must affirm its decision. (*People v. Myers, supra,* 69 Cal.App.4th at p. 310; *Carmony, supra,* 33 Cal.4th at p. 378.)

## VII.  Recall of Third Strike Sentence Under Proposition 36

Defendant contends this court should vacate his third strike sentence and remand the matter for resentencing pursuant to the provisions of Proposition 36, which was passed by initiative after the sentencing hearing in this case. Defendant argues he is within the terms of the initiative because his current offenses for second degree burglary and willful evasion were not serious or violent felonies, and he is no longer eligible for a third strike term given the law's passage.

As we will explain, defendant filed a petition for recall of his sentence with the superior court, and the court did not abuse its discretion when it denied the motion.

### A. The Sentencing Hearing

The sentencing hearing was held on October 17, 2012, just a few weeks before the November 2012 General Election. At the sentencing hearing, defense counsel argued there was every chance Proposition 36 was going to be approved in the election. Defense counsel argued the initiative would give relief to people in defendant's situation, who had prior strike convictions but whose current offenses were not serious or violent. Counsel argued it would be unfair to deprive defendant of a benefit which others might receive in a few weeks.

As set forth in section VI, *ante*, the court acknowledged the nature of the two substantive offenses, but denied defendant's request to dismiss the strike offenses because it had "a fundamental obligation to protect the community" and found that defendant's behavior suggested that he "will not stop. He will simply not stop." The court also addressed defense counsel's comments about the possible passage of Proposition 36.

> "[T]he court may have some authority in the future to do something different than what it did, I don't know, that's up to the voters of the State of California. But, this court understands this has authority right now to strike strikes, and this court has made a specific decision based on the interest of justice not to do so.
>
> "I have no reason to believe that I can change the law that doesn't demand some other course of action would change this court's view about the appropriate sentence in this matter."

## B. Enactment of Proposition 36

"On November 6, 2012, the voters approved Proposition 36, the Three Strikes Reform Act of 2012, which amended [Penal Code] sections 667 and 1170.12 and added [Penal Code] section 1170.126 (hereafter the Act). The Act changes the requirements for sentencing a third strike offender to an indeterminate term of 25 years to life imprisonment. Under the original version of the three strikes law a recidivist with two or more prior strikes who is convicted of any new felony is subject to an indeterminate life sentence. The Act diluted the three strikes law by reserving the life sentence for cases where the current crime is a serious or violent felony or the prosecution has pled and proved an enumerated disqualifying factor. In all other cases, the recidivist will be sentenced as a second strike offender. (§§ 667, 1170.12.) The Act also created a postconviction release proceeding whereby a prisoner who is serving an indeterminate life sentence imposed pursuant to the three strikes law for a crime that is not a serious or violent felony and who is not disqualified, may have his or her sentence recalled and be sentenced as a second strike offender *unless the court determines that resentencing would*

63.

*pose an unreasonable risk of danger to public safety*.  (§ 1170.126.)" (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 167–168, quoting § 1170.126, subd. (f), italics added.)

### C. **Petition to Recall**

On December 12, 2012, while this case was pending on appeal, defendant filed a petition with the superior court to recall his third strike sentence of 50 years to life, and resentence him pursuant to the recent enactment of Proposition 36, because his current offenses were not serious or violent.

On January 10, 2013, the superior court denied defendant's petition to recall his sentence, found he was not entitled to relief under Proposition 36, and noted it had addressed this issue at the sentencing hearing:

> "After hearing from counsel and consideration of the probation report, the Court sentenced the defendant to two consecutive life terms pursuant to the existing three strikes law.  In anticipation of the voter's approval of Prop. 36, the Court made a specific finding, on the record, that the defendant in fact posed an unreasonable risk of danger to public safety if not confined to the state prison for those life terms, based on the circumstances of his criminal conduct in the instant case as well as his prior criminal history.  The Court further found that if Prop. 36 was approved by the voters in November [2012], the Court would nevertheless decline a request to resentence the defendant to a lesser term, in light of the unreasonable risk to public safety if the defendant were allowed an earlier release from prison."

### D. **Analysis**

While defendant may have been eligible to petition for resentencing since his current offenses were not serious or violent, the superior court had discretion to deny his petition for recall based on the provisions of section 1170.126, subdivision (f), "that resentencing the petitioner would pose an unreasonable risk of danger to public safety." In exercising this discretion, the court may consider:

"(1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes;

"(2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and

"(3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

When applying these definitions, "dangerousness is a hurdle which must be crossed in order for a defendant to be resentenced at all. If the court finds that resentencing a prisoner would pose an unreasonable risk of danger, the court does not resentence the prisoner, and the petitioner simply finishes out the term to which he or she was originally sentenced." (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1303, fn. omitted (*Kaulick*).) The petitioner's dangerousness "need not be established by proof beyond a reasonable doubt to a jury" and "the proper standard of proof is preponderance of the evidence." (*Id*. at pp. 1303, 1305; *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075–1076.) We thus review the record to determine if the court abused its discretion in finding by a preponderance of the evidence that appellant "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f); *Kaulick, supra,* 215 Cal.App.4th at p. 1301.)[20]

In this case, the superior court was clearly aware of its discretionary authority in light of the enactment of Proposition 36. It made extensive findings at the sentencing hearing about defendant's current dangerousness in anticipation that the initiative would

---

[20] On appeal, defendant argues Proposition 36 should be retroactively applied to his case, and this court should vacate the sentence and remand; he never addresses his petition for recall or the superior court's findings. In contrast, the People curiously argue that defendant must first seek relief before the superior court, and then concede such a petition was already filed and denied. We will address defendant's sentencing issue based on the record before this court – that he already filed a petition for recall, and the court denied the petition based on the finding of an unreasonable risk of danger.

be enacted, and referenced those findings when it denied defendant's petition for recall. The court considered defendant's criminal history, his record of reoffending, how his offenses endangered other members of the public, his complete disregard for the safety of others, and his desperate attempts to avoid prosecution and punishment for his offenses.

The court did not abuse its discretion when it denied defendant's petition for recall, and its findings regarding defendant's dangerousness are supported by substantial evidence.

## VIII. Proposition 47

While this case was pending on appeal, we granted leave for the parties to file supplemental briefing as to the possible application of Proposition 47 to defendant's conviction in count I for felony second degree commercial burglary.

On November 4, 2014, voters enacted Proposition 47, entitled "the Safe Neighborhoods and Schools Act" (hereafter Proposition 47). It went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).) As of its effective date, Proposition 47 classifies as misdemeanors certain drug- and theft-related offenses that previously were felonies or "wobblers," unless they were committed by certain ineligible defendants. (§ 1170.18, subd. (a).)

As relevant to this case, prior to the passage of Proposition 47, a person who entered a commercial business and stole property could be charged and convicted of felony second degree burglary. (§§ 459, 460, 461) After the enactment of Proposition 47, the same perpetrator may only be charged and convicted of misdemeanor shoplifting if the value of the stolen property does not exceed $950, and the offender has not committed a prior "super strike" offense as defined in section 667, subdivision (e)(2)(C) or an offense which requires registration under section 290, subdivision (c). (§ 459.5, subd. (a).)

Defendant contends this court must vacate his conviction and sentence for felony commercial burglary in count I because the record implies the value of the stolen

property was approximately $200; he has not suffered any prior "super strike" offenses; and this court must automatically reclassify count I as a misdemeanor conviction for shoplifting pursuant to the minifying provisions of Proposition 47 based on the equal protection analysis set forth in *In re Estrada* (1965) 63 Cal.2d 740. The People reply that defendant is not entitled to the automatic reclassification of his felony offense and he must comply with Proposition 47's provisions, which require that he file a petition for recall in the superior court to request resentencing. We agree with the People's argument.

We begin with section 1170.18, a new resentencing provision created by Proposition 47, under which "[a] person currently serving a sentence for a conviction, whether by trial or plea, of a felony or felonies who would have been guilty of a misdemeanor under the act that added this section had this act been in effect at the time of the offense *may petition for a recall of sentence* before the trial court that entered the judgment of conviction in his or her case" and request resentencing. (§ 1170.18, subd. (a).)

"If the petitioner satisfies the criteria in [section 1170.18,] subdivision (a), the petitioner's felony sentence shall be recalled and the petitioner resentenced to a misdemeanor … unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety. In exercising its discretion, the court may consider all of the following: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes. [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated. [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).)

"As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).)

Section 667, subdivision (e)(2)(C)(iv) lists eight felonies or classes of felonies, sometimes called "super strike" offenses, including certain classes of sexually violent offenses, child molestation offenses, and assaultive offenses; possession of a weapon of mass destruction; solicitation to commit murder; any serious and/or violent felony offense punishable by life imprisonment or death; and "[a]ny homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive."[21] (§ 667, subds. (e)(2)(C)(iv)(I)–(e)(2)(C)(iv)(VIII).)

We find the analysis in *People v. Yearwood*, *supra*, 213 Cal.App.4th 161 is similarly applicable to the issues raised in this case, and defendant's arguments are without merit. Defendant is not entitled to automatic reclassification of his felony conviction to a misdemeanor under the provisions of Proposition 47, and the prospective application of the statutory provisions for a petition for recall does not violate defendant's equal protection rights under *In re Estrada*, *supra*, 63 Cal.2d 740. (*Yearwood*, *supra*, at pp. 168, 171–179.) Defendant, as a person "currently serving a sentence for a conviction," is limited to the statutory remedy provided in Proposition 47 of filing a "petition for a recall of sentence before the trial court that entered the judgment of conviction in his or her case to request resentencing" in accordance with the newly enacted section 459.5 and other applicable provisions. (§ 1170.18, subd. (a); *People v. Yearwood, supra,* 213 Cal.App.4th at pp. 170, 177.) At that time, the trial court may

---

[21] The enumerated homicide provisions are for first degree murder (§§ 187, 190), first degree murder with special circumstances (§§ 190.1–190.4), second degree murder (§§ 187, 190, 190.05), vehicular manslaughter while intoxicated (§ 191.5), and gross vehicular manslaughter while intoxicated (§ 191.5).

consider defendant's petition and whether he is eligible for resentencing, exercise its discretion to evaluate the statutory factors, and determine whether he would "pose an unreasonable risk of danger to public safety" as defined in section 1170.18, subdivision (b), which includes the "unreasonable risk" that he could commit "[a]ny homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive." (§ 667, subd. (e)(2)(C)(iv).)[22]

## DISPOSITION

The People's request to disclose the balance of the confidential *Marsden* transcripts is denied.

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
GOMES, J.

---

[22] We do not address the merits of the court's potential exercise of discretion. We note, however, that when the court addressed defendant's petition for relief under Proposition 36, it specifically referenced the extensive findings it made at the sentencing hearing when it declined to dismiss any of his prior strike convictions: that defendant engaged in a "desperate" act and put "the lives of everyone at risk" when he escaped by speeding in the wrong direction on the highway, and the court had a "fundamental obligation to protect the community" because his "desperation makes him a danger to everyone."